# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH J. RIZZUTI, JOSEPH J. RIZZUTI, JR., KARISSA M. RIZZUTI, and J.R.,[1]<br>*Plaintiffs*,<br><br>v.<br><br>OFFICER MICHAEL CAPPABIANCA, JR.,<br>OFFICER DIONY NUNEZ, and<br>THE CITY OF WORCESTER,<br><br>*Defendants*. | Civil Action No. 4:22-cv-40094-MRG |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 38)

**GUZMAN, J.**

Joseph J. Rizzuti, Sr. ("Rizzuti Sr."), Joseph J. Rizzuti, Jr. ("Rizzuti Jr."), Karissa M. Rizzuti ("Karissa") and J.R. (collectively, "Plaintiffs"), bring forth this action against Worcester Police Department Officers Michael Cappabianca, Jr. ("Cappabianca") and Diony Nunez ("Nunez"), and the City of Worcester (collectively, "Defendants"). [ECF No. 10 ("Am. Compl.")]. Specifically, Plaintiffs raise thirteen claims against Defendants, which can be grouped as follows: false arrest and excessive force (42 U.S.C. § 1983 ("Section 1983") and state — Counts I-III, XI); assault and battery (state — Counts IV-VI)[2]; conspiracy (Section 1983 and common law — Counts VII-IX); malicious prosecution (federal and state — Count X); municipal liability (Section 1983 — Count XII); and intentional infliction of emotional distress (state — Count XIII). [Am. Compl.].

---

[1] Pursuant to Fed. R. Civ. P. 5.2 (c)(3), the initials of the minor Plaintiff, J.R. will be used.

[2] Count V section heading refers to Rizzuti Sr., which would duplicate Count IV; instead, the Court understands this to be a reference to Rizzuti Jr. [Am. Compl. ¶¶ 283-88].

Pending before the Court is Defendants' Motion for Summary Judgment. [ECF No. 38]. For the reasons stated below the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    <u>BACKGROUND</u>

### A.  <u>Relevant Facts[3]</u>

This civil rights lawsuit arises from an arrest of the Plaintiffs inside Cornerstone Bible Baptist Church[4] (the "Church")—a church founded by Rizzuti Sr. and other members of the Rizzuti family—on Sunday, August 25, 2019. [Am. Compl. ¶ 1; ECF No. 48 ("Pls. Resp. SOMF") ¶ 2, 23]. The incident began when the Worcester Police Department ("WPD") received a report from a father alleging that his preteen daughter had not been returned by her biological mother, Rachael Rizzuti ("Rachael"), who is the daughter of Rizzuti Sr., and the sister of Rizzuti Jr. [Pls. Resp. SOMF ¶¶ 11, 15-18]. In response, law enforcement obtained authorization to ping the child's cell phone, which indicated a location at 78 Waverly Street—the Church.[5] [Id. ¶¶ 21-22]. Officers Cappabianca and Nunez were dispatched to the Church to locate Rachael and question her regarding the ongoing custody dispute and to conduct a wellness check on the child. [Pls. Resp. SOMF ¶ 22; ECF No. 65 at 2]. The officers arrived at or shortly after 7 p.m. that evening. [Pls. Resp. SOMF ¶ 24].

Officer Nunez was the first to respond to the scene. [Id. ¶¶ 25-26]. While it is undisputed that preachings had concluded and some congregants were departing the Church, Plaintiffs allege that Rizzuti Jr. was "still at the pulpit and closing prayers were about to start."[6] [Id. ¶ 24]. Upon entering the Church, Officer Nunez asked if there was someone in charge with whom he could

---

[3] The facts are drawn from the parties' statements of material facts and responses. To the extent necessary, the Court will supplement from other materials in the record. Any factual disputes, as well as their materiality, are addressed <u>infra</u>.

[4] Plaintiffs' opposition brief provides a different name: "Christian Baptist Tabernacle Church." [ECF No. 51 at 1].

[5] The Church is on the ground floor of a six-apartment building. [Pls. Resp. SOMF ¶ 23].

[6] Officer Nunez contends that, upon entering the Church, he saw people standing around and talking and it did not appear to him that a service was going on. [<u>Id.</u> ¶ 25].

speak to. [Id. ¶ 25]. Rizzuti Sr., Rizzuti Jr., Karissa, J.R., Rachael, and her daughter, all members of the church, were present that Sunday evening. [See generally Am. Compl.]. Rizzuti Jr. responded that he was in charge, and the two exited the Church to speak outside. [Pls. Resp. SOMF ¶ 25]. Unaware that he was speaking with a member of the Rizzuti family, Officer Nunez asked Rizzuti Jr. if he could speak with Rachael. [Id. ¶ 26]. At that point, Rizzuti Sr. approached the group with his grandson, J.R. [Id. ¶ 28]. Rachael also joined the group outside with her daughter, introduced herself to Officer Nunez, and was informed that he wished to speak with her concerning the well-being of her daughter. [See id. ¶¶ 28, 30]. Upon learning that Officer Nunez had arrived to conduct a wellness check on his granddaughter, Rizzuti Sr. handed his grandson to Rizzuti Jr., who began escorting the child back inside the Church. [Id. ¶ 30]. At that time, the individuals remaining on the sidewalk were Rizzuti Sr., Rachael, her daughter, and Officer Nunez. [Id. ¶ 31].

Rizzuti Sr. believed that that Officer Nunez's intentions were to persuade his daughter to allow his granddaughter to leave with WPD. [Id. ¶ 33]. Rizzuti Sr. began instructing Rachael to ask Officer Nunez whether she was being detained and whether there was any legal paperwork authorizing removal of the child. [See ECF No. 49 ("SAMF"), Ex. 5 (Rizzuti Sr. Dep.) at 85:18-85:24]. When Officer Nunez responded "no," Rizzuti Sr. alleges that the officer nevertheless continued to question his daughter about his granddaughter. [See Pls. Resp. SOMF ¶ 34]. At that point, Rizzuti Sr. began to interject between Officer Nunez and Rachael's conversation and started yelling at her to leave immediately. [Pls. Resp. SOMF ¶¶ 34-35; see SAMF, Ex. 5 (Rizzuti Sr. Dep.) at 87:21-88:2].

At that time, Officer Cappabianca arrived on the scene, exited his cruiser, and approached the group gathered on the sidewalk. [Pls. Resp. SOMF ¶ 36; ECF No. 65 at 2]. He activated his body camera, which began recording as he walked towards the sidewalk while Rizzuti Jr. carried

his son into the Church.[7] [Pls. Resp. SOMF ¶ 39]. Rachael then crossed the street with her daughter and entered her vehicle. [Id. ¶ 41]. Officer Nunez followed her across the street, continuing his efforts to gain her cooperation. [Id.].

Meanwhile, Officer Cappabianca remained on the sidewalk in front of the Church alongside Rizzuti Sr., who appeared to be speaking in Rachael's direction. [Id. ¶ 42]. Rachael and her child then drove off from the scene, after which both officers began returning to their cruisers. [Id. ¶ 57]. The Body Camera Footage then captures a shift in perspective to Officer Cappabianca's right, where Rizzuti Sr. continues to "scold" his daughter to leave the scene. [Id. ¶¶ 42-43; Body Camera Footage]. As Officer Cappabianca passed Rizzuti Sr. on his way back to his cruiser, he asked Rizzuti Sr. who he was and instructed him to return inside the Church, stating that the situation had "nothing to do with" him. [Id. ¶ 46]. Upset by the entirety of the situation unfolding outside his Church and involving his family, Rizzuti Sr. responded that Rachael was his daughter and, therefore, he "had a lot to do with [the situation]." [Id. ¶¶ 46-48].

Continuing toward his cruiser, Officer Cappabianca stepped off the sidewalk. At that point, Rizzuti Sr., who was now behind Officer Cappabianca, raised his voice, called Officer Cappabianca a "tyrant," and objected to being told what to do. [Id. ¶¶ 57-58]. As Officer Cappabianca neared his cruiser, Rizzuti Sr. again called him "tyrant," prompting Officer Cappabianca ask him if he was "done yelling." [Id. ¶ 58]. Rizzuti Sr. replied, "Pardon me?," to which Officer Cappabianca repeated, "You done yelling?" [Id.]. At that point Officer Cappabianca turned away from his cruiser and began walking back toward Rizzuti Sr., who remained standing in front of the Church. [SAMF ¶ 15; Body Camera Footage]. Rizzuti Sr. then interjected, "Are you

---

[7] The body worn camera footage that was submitted for the record can be viewed at this link: https://www.dropbox.com/scl/fo/fdp4pu43fdejory0wxq60/AJXzhlWZtZJ8U6KAVYP7B04?rlkey=at1v6gan3d5n7fq wlebj2wge0&e=5&st=e94bpwdu&dl=0 ("Body Camera Footage").

done yelling, acting like a bigshot?" [Am. Compl. ¶ 76; Pls. Resp. SOMF ¶ 59]. Officer Cappabianca responded, "We're all done here, you can go inside," to which Rizzuti Sr. replied, "No, you go on." [Am. Compl. ¶¶ 78-79; Pls. Resp. SOMF ¶¶ 58-59]. At this time, Rizzuti Jr. exited the front door of the Church and returned to the sidewalk. [Pls. Resp. SOMF ¶ 59].

While continuing to approach Rizzuti Sr., Officer Cappabianca told Rizzuti Sr. that he would not be told what to do and ordered Rizzuti Sr. to go inside, adding that Rizzuti Sr. was "about to be arrested for disturbing the peace." [Id. ¶¶ 59-61]. By then, Officer Cappabianca was nearly back on the Church's sidewalk, and Rizzuti Jr. stepped between him and Rizzuti Sr. [SAMF ¶ 62; Body Camera Footage].

After Officer Cappabianca stated that Rizzuti Sr. was about to be placed under arrest, Rizzuti Sr. backed toward the Church entrance, demanded the officers summon a supervisor, and again called Officer Cappabianca a "tyrant." [Pls. Resp. SOMF ¶¶ 61-62]. Officer Cappabianca then lunged forward to place Rizzuti Sr. under arrest.[8] [Pls. Resp. SOMF ¶ 63; Body Camera Footage]. In response, Rizzuti Sr. turned and ran into the Church. [Pls. Resp. SOMF ¶ 64]. Officer Cappabianca then forcefully pushed through Rizzuti Jr. and rushed into the Church.[9] Rizzuti Jr. and Officer Nunez followed the chase inside. [See id. ¶ 74].

Rizzuti Sr. ran through the Church and up to the altar before slipping and falling. [Id. ¶¶ 70-71]. Officer Cappabianca, in close pursuit, prevented Rizzuti Sr. from regaining his balance. [Id. ¶ 72]. Rizzuti Sr. laid face-down on the ground with his arms visibly interlocked beneath his

---

[8] Plaintiffs contend that Cappabianca never provided Rizzuti Sr. an opportunity to submit to arrest. [Pls. Resp. SOMF ¶ 63]. Rizzuti Sr. also alleges that Cappabianca was advancing to fight with him, not for the sole purpose of arresting him. [Id.].

[9] Cappabianca alleges that he was struck by the door after Rizzuti Sr. had passed through it. A congregant inside the Church at the time testified that she saw Rizzuti Sr. run into the Church and swing the door behind him—at which point Cappabianca was struck. [Id. ¶¶ 66-69].

head. [Id. ¶ 73]. The parties dispute whether Officer Cappabianca issued any verbal commands instructing Sr. to free his hands for arrest. [Id. ¶ 73].

Rizzuti Jr. quickly approached his father and Officer Cappabianca, asking, "what are you doing?" and came within approximately one arm's reach of the encounter. [SAMF, Ex. 8 (Rizzuti Jr. Dep.) at 126:19-127:5]. Officer Nunez, who had just witnessed Rizzuti Jr. running behind Officer Cappabianca during the pursuit of his father and now in proximity of his father's arrest, approached Rizzuti Jr. and punched him in the face. [Am. Compl. ¶ 120; Pls. Resp. SOMF ¶¶ 77-78]. Officer Nunez attempted additional strikes, but Rizzuti Jr. moved backward in an effort to create distance and was able to dodge the subsequent punches. [Pls. Resp. SOMF ¶¶ 78-79].

Nunez attempted to take control of Rizzuti Jr.'s arm, and Rizzuti Jr. pulled backwards. In response, Officer Nunez displayed his O.C. spray to obtain compliance. [Id. ¶ 79]. Threatened with pepper spray, Rizzuti Jr. appeared to stop resisting, which prompted Officer Nunez to return the spray to its holster. [Id.]. Rizzuti Jr. then went to the ground on his own. [Id. ¶ 80]. At that time, Officer Cappabianca was still attempting to secure Rizzuti Sr. [Id. ¶ 81]. Karissa Rizzuti and her child, J.R., were present inside the Church. [See Pls. Resp. SOMF ¶ 75; SAMF, Ex. 8 (Rizzuti Jr. Dep.) at 130:17-132:4]. While holding Rizzuti Sr. on the ground, Officer Cappabianca deployed his Taser,[10] and punched and kneed Rizzuti Sr. more than once. [Am. Compl. ¶¶ 6, 90, 94, 116; Pls. Resp. SOMF ¶ 82]. Rizzuti Sr. then relinquished his hands and was handcuffed. [Am. Compl. ¶¶ 6, 90, 94, 116; Pls. Resp. SOMF ¶ 82]. Officer Cappabianca subsequently called for backup. [Pls. Resp. SOMF ¶ 85].

Once Rizzuti Jr. was handcuffed, Officer Nunez began searching his person by removing items from his pockets and placing them on the ground for inspection. [Id. ¶ 86]. Rizzuti Jr. told

---

[10] Plaintiffs alleged that Rizzuti Sr. was tased twice. [Am. Compl. ¶¶ 90, 116].

Officer Nunez to stop touching him and yelled, "get out of my stuff." [Id. ¶¶ 88, 90]. Rizzuti Sr., who was then seated on the floor and observing his son's arrest, called Officer Nunez a "homo." [Id. ¶ 89]. As Officer Nunez continued removing items from Rizzuti Jr.'s pockets, Karissa, Rizzuti Jr.'s pregnant wife, began collecting those items from the ground. [SAMF, Ex. 8 (Rizzuti Jr. Dep.) at 146:2-18, 147:17-20]. Officer Nunez then allegedly turned to Karissa, struck her in the face, brought her to the ground, flipped her onto her stomach, and placed her in handcuffs. [Am. Compl. ¶ 123; SAMF, Ex. 8 (Rizzuti Jr. Dep.) at 146:2-8]. Karissa quickly informed Officer Nunez that she was pregnant and wanted medical attention. [Am. Compl. ¶ 132]. Shortly after Rizzuti Sr. was tased and Karissa was arrested, an ambulance was called; however, Karissa declined medical treatment. [Id. ¶¶ 118, 132]. J.R., who was two years old at the time, was present during the altercation but was not physically contacted by police. [Pls. Resp. SOMF ¶ 5; see generally Pls. Resp. SOMF].

Rizzuti Sr., Rizzuti Jr., and Karissa were arrested and charged with various crimes, among them assault and battery on a police officer, resisting arrest, and interfering with a police investigation. [See Pls. Resp. SOMF ¶ 103]. The entire encounter— the officers' arrival to the Plaintiffs being escorted out of the Church in handcuffs by additional WPD support officers— lasted just under seven minutes.[11] All charges against Rizzuti Sr., Rizzuti Jr., and Karissa, were ultimately either dismissed or resulted in acquittals in Worcester District Court. [Am. Compl. ¶¶ 148-53].

B. **Procedural History**

Rizzuti Jr. filed a *pro se* complaint on August 23, 2022, on behalf of Rizzuti Sr., Karissa M. Rizzuti, J.R., and Rachael J. Rizzuti. [ECF No. 1]. Upon securing counsel, Plaintiffs filed an

---

[11] [See Body Camera Footage].

Amended Complaint on December 29, 2022.[12] [Am. Compl.]. After a prolonged discovery period, Defendants filed the present motion for summary judgment on March 18, 2025, along with a statement of material facts and a memorandum in support. [ECF Nos. 38; 39; 40]. Plaintiffs subsequently filed their opposition, accompanied by their response to Defendants' statement of material facts and their statement of additional material facts. [Pls. Resp. SOMF; SAMF; ECF No. 51]. The Court heard oral argument on the present motion for summary judgment on April 23, 2025. The pending motion for summary judgment is thus ripe for adjudication.

## II.  **LEGAL STANDARDS**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must therefore demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The burden then shifts "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (collecting cases). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

A genuine issue exists when the evidence permits "a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). In other words, there must be "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing version of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). A material fact is "one that has the potential of affecting the outcome

---

[12] The Amended Complaint did not name Rachael J. Rizzuti as a plaintiff. [Am. Compl.].

of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248-50). Summary judgment must be denied "when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant[.]" Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997).

"Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." Butters v. Wells Fargo Advisors, LLC, No. 10-10072-MLW, 2012 WL 5959986, at *1 (D. Mass. Nov. 27, 2012) (quoting Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass.), aff'd, 129 F.3d 1252 (1st Cir. 1997)). The non-moving party must state the specific facts that are disputed which prevent the granting of summary judgment. Brown, 957 F. Supp. at 1297 (citing Vasapolli v. Rostoff, 864 F. Supp. 215, 218 (D. Mass. 1993), aff'd, 39 F.3d 27 (1st Cir. 1994)). The nonmovant must "go beyond merely asserting the existence of a disputed and material fact[,]" and produce evidence that "substantially proves the existence of such a disputed fact." Lucia v. Prospect St. High Income Portfolio, Inc., No. 90-10781-MA, 1993 WL 761409, at *5 (D. Mass. Aug. 26, 1993) (citing Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991)).

In analyzing motions for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. Gattineri v. Wynn MA, LLC, 63 F.4th 71, 85 (1st Cir. 2023) (quoting Doe v. Tr. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). Parties may not rely on "conclusory allegations or substantiated denials" and must take facts "derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)). In any event, if there is "sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party[,]" the Court will deny the motion. <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). Otherwise, the motion should be granted.

## III.    **DISCUSSION**

### A.    **Statute of Limitations**

Defendants contend that Rizzuti Sr., Karissa, and J.R.'s claims are barred by the applicable three-year statute of limitations.[13] [ECF No. 40 at 5 (citing Mass. Gen. Laws ch. 260, §§ 2A, 4, 5B)]. A cause of action accrues when the plaintiff "knows or has reason to know of the injury which is the basis for his claim." <u>See</u> <u>Kennedy v. Town of Billerica</u>, 502 F. Supp. 2d 150, 155 (D. Mass. 2007), <u>aff'd</u>, 617 F.3d 520 (1st Cir. 2010) (Section 1983) (citation omitted); <u>Nieves v. McSweeney</u>, 241 F.3d 46, 51-52 (D. Mass. 2006) (false arrest, excessive use of force, and malicious prosecution claims); <u>Pagliuca v. City of Boston</u>, 626 N.E.2d 625, 628 (Mass. App. Ct. 1994) (state law tort claims). Here, Plaintiffs would have become aware of their injuries on the day their arrests took place: August 25, 2019.[14]

The original Complaint in the present case was filed on August 23, 2022, prior to the statute of limitations expiring. [ECF No. 1]. However, as Defendants point out, although the pleadings named Rizzuti Sr., Rizzuti Jr., Karissa, and J.R. as plaintiffs, the original complaint was only signed by Rizzuti Jr. [<u>Id.</u>]. Rizzuti Jr. testified that he was solely responsible for the document and that he was acting *pro se* when he created the pleadings. It is settled law that "a *pro se* party cannot represent people other than him[self] . . . . The rule even bars a non-lawyer parent from

---

[13] "The Court looks to state law to determine the statute of limitations in a § 1983 action. Thus, Plaintiff's federal and state claims are governed by the same three-year statute of limitations." <u>Alvarez v. City of Worcester</u>, 450 F. Supp. 3d 74, 79 n.2 (D. Mass. 2020) (citing <u>Nieves v. McSweeney</u>, 241 F.3d 46, 51 (1st Cir. 2001)).

[14] Defendants concede that the statute of limitations would not have begun on August 25, 2019 for Plaintiffs' malicious prosecution claims and instead would have begun in 2022 after Plaintiffs; criminal trials were resolved. [ECF No. 40 at 7 n. 4]; <u>see</u> <u>Nieves</u>, 241 F.3d at 53 (explaining that "a cause of action for malicious prosecution does not accrue until the termination of the criminal proceedings").

representing his or her child." <u>Hootstein v. Amherst-Pelham Reg'l Sch. Comm.</u>, 361 F. Supp. 3d 94, 101 (D. Mass. 2019) (collecting cases). Thus, although the original *pro se* complaint brought claims on behalf of all the named Plaintiffs, the Court was unable to consider any of the claims brought on behalf of Rizzuti Sr., Karissa, or J.R. <u>See</u> <u>id.</u>

On December 29, 2022, the first Amended Complaint was filed by counsel, appropriately bringing claims on behalf of Rizzuti Sr., Rizzuti Jr., Karissa, and J.R. [Am. Compl.]. Defendants contend that this pleading was filed twenty days[15] after the statute of limitations expired and thus barred any claims brought on behalf of Rizzuti Sr., Karissa, or J.R. [ECF No. 40 at 8]. However, an amended complaint filed after the statute of limitations period may still be proper if it relates back to the date of the original complaint. <u>See</u> <u>Young v. Lepone</u>, 305 F.3d 1, 13-14 (1st Cir. 2002). An amendment relates back to the date of the original pleading when:

> the amendment changes the party or the naming of the party against whom a claim is asserted if . . . the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

<u>Id.</u> (quoting Fed. R. Civ. P. 15(c)(3), now Fed. R. Civ. P. 15(c)(1)(C)).

The First Circuit has explained that even though the text of rule seems to discuss changes in the identity of defendants, the "rule can be applied to amendments that change the identity of plaintiffs." <u>Id.</u> at 14; <u>see</u> Charles Alan Wright & Arthur R. Miller et al., <u>6A Fed. Prac. & Proc.</u> § 1501 (3 ed. 2025) ("As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, defendant's ability to protect itself will not be prejudicially affected if a new plaintiff is added, and defendant should not be permitted to invoke a limitations

---

[15] [<u>See</u> ECF No. 40 at 7 n.5 (complicated calculations regarding SOL and Pandemic Tolling and Pandemic Tolling's applicability to 1983 claims)].

defense."). Defendants argue that even if it is plausible that amending the Plaintiffs can relate back to the original complaint, the opinion in Young rejects the relation-back doctrine in a situation like the present. [ECF No. 40 at 9]. In Young, the plaintiffs amended their complaint to add corporate shareholders as plaintiffs and introduce additional federal securities claims. 305 F.3d at 13. In rejecting the amendment, the court emphasized that the important consideration in determining whether an introduction of plaintiffs relates back is ensuring that a "defendant is not called upon to defend against new facts and issues." Id. at 15. This is because the filing of an action by one plaintiff does not necessarily give "a defendant notice of the impending joinder of any or all similarly situated plaintiffs." Id. It thus follows that relation-back is not "available merely because a new plaintiff's claims arise from the same transaction or occurrence as the original plaintiff's claims." Id. at 16. Here, there is no concern that the Defendants are being asked to defend "against new facts and issues." See id. at 15. The original pro se Complaint listed the names of all the involved plaintiffs, the facts that relate to those plaintiffs, and the Defendants knew or should have known but for the mistake in the original pro se Complaint. [ECF No. 1].

Defendants also rely on two federal district court cases for their proposition that the relation-back doctrine cannot apply when a new plaintiff is added after the expiration of the applicable statute of limitations. [ECF No. 40 at 9-10]. In the Court's opinion, both cases can be distinguished to the situation at hand. First, the Defendants cite Rizzuto v. City of New York, No. 17-cv-7381, 2023 WL 5018484 (E.D.N.Y. Feb. 24, 2023), report and recommendation adopted, 2023 WL 4446659 (E.D.N.Y. July 11, 2023), where the court similarly rejected the application of the relation-back doctrine where a plaintiff sought to add plaintiffs after the statute of limitations expired. Id. at *4. The court explained that a dispositive factor was whether the omission of the new plaintiffs was due to mistake. Id. There, the court found no evidence justifying the plaintiffs'

inability to identify the proper parties at the time of the complaint nor why they were unable to serve a complaint prior to the expiration of the statute of limitations. Id. Consequently, the court concluded that their conduct was a deliberate and that the new plaintiffs were added in a manner to circumvent the statute of limitations. Id. at *5 In the instant case, Rizzuti Sr.'s actions were not deliberate but rather a mistake caused by a *pro se* litigant. The First Circuit has recognized that *pro se* litigants are more likely to make technical and clerical errors. See Instituto de Educacion Universal Corp. v. U.S. Dep't of Educ., 209 F.3d 18, 23 (1st Cir. 2000) (recognizing that a *pro se* litigant is far more likely to make technical errors); Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 27 (1st Cir. 2018) ("We are sensitive to the challenges that *pro se* plaintiffs face in pleadings and do not condemn inexperienced plaintiffs to be forever bound by their clerical errors and minor factual slip-ups."). Therefore, unlike Rizzuto, where the plaintiff made a deliberate attempt to circumvent the statute of limitations, the Plaintiffs in this case filed a complaint that identified the proper parties at the time of the original complaint and the error of Rizzuti Jr., appearing *pro se*, is the only reason the original complaint was not valid for the other named Plaintiffs.

Second, Defendants cite to Litton v. City of Millersville, No. 3:18-CV-01101, 2020 WL 127648 (M.D. Tenn. Jan. 10, 2020), report and recommendation adopted, 2020 WL 470391 (M.D. Tenn. Jan. 29, 2020) There, the court held that a *pro se* plaintiff's amendment that added new plaintiffs was foreclosed because the amendment created a new cause of action. 2020 WL 127648 at *6 (citing Asher v. Unarco Material Handling, Inc., 596 F.3d 313, 318 (6th Cir. 2010)). The court explained that the timely notice of one plaintiff's original claims does not allow an untimely plaintiff to piggyback, because an action filed by one plaintiff does not give notice to a defendant that other similarly situated plaintiffs may join. Id. (citing Young, 305 F.3d at 15). Unlike in Litton,

the present situation involved the defendants being informed in a timely manner of the identities of the Plaintiffs, the facts of their cases, and the claims they sought to bring in the original complaint. Therefore, the Defendants in this case had adequate notice of the Plaintiffs from the beginning.

As explained above, Rule 15(c) contemplates amendments changing the parties in a case. Although Rule 15(c) does not explicitly mention amended pleadings adding new plaintiffs, the Advisory Committee Note to the 1966 amendment of the rule recognizes that "[t]he relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier." Fed. R. Civ. P. 15 advisory committee note to 1966 amendment. "As long as defendant is fully apprised of a claim arising from specific conduct and has prepared to defend the action, defendant's ability to protect itself will not be prejudicially affected if a new plaintiff is added, and defendant should not be permitted to invoke a limitations defense." Wright & Miller, supra, § 1501. Indeed, the rule's requirement that the identities of the new parties be known or should have been known "but for a mistake concerning the proper party's identity," Fed. R. Civ. P. 15(c)(1)(C)(ii), should not be read to be limited to instances of misnomer. See Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 549 (2010) ("The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him." (emphasis added)); In re Integrated Res. Real Est. Ltd. P'ships Sec. Litig., 815 F. Supp. 620, 644 (S.D.N.Y. 1993) ("The 'mistake' condition does not isolate a specific type or form of error in identifying parties, but rather is concerned fundamentally with the new party's awareness that failure to join it was error rather than a deliberate strategy.") (citation omitted). Here, the Defendants were on notice of Rizzuti Sr.'s, Karissa's, and J.R.'s claims from the time of Rizzuti Jr.'s original *pro se* complaint. Their identities as Plaintiffs were disclosed in

the original complaint, but Rizzuti Jr.'s *pro se* filing effectively nullified the advancement of their claims. The filing by counsel of the amended complaint only served to make their filing official. See Wright & Miller, supra, § 1501 ("As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, defendant's ability to protect itself will not be prejudicially affected if a new plaintiff is added, and defendant should not be permitted to invoke a limitations defense.").

Accordingly, the Amended Complaint relates back to the original complaint because it 1) arises out of the same transaction or occurrence advanced in the original pleading, 2) the Defendants received adequate notice in the original complaint of who the other Plaintiffs would be and the claims that would be brought, and 3) the Defendants knew or should have known that, but for the mistake in the *pro se* filing, the action would have been brought against them. See Young, 305 F.3d at 15-16. Thus, the Court does not find that Plaintiffs' claims are barred by the statute of limitations. Having completed the analysis of this threshold issue, the Court turns now to the merits of the claims.

**B.    J.R.'s Claims Fail as a Matter of Law**

Although there are no headings that identify J.R. as a Plaintiff, Counts XII and XIII state that those claims are being brought on behalf of all Plaintiffs. [Am. Compl. at 30-31]. For the reasons that follow, J.R. claims fail as a matter of law. The Court takes each count in turn.

**1.    *Count XII: Section 1983 against City of Worcester***

A city or other local government may be liable under Section 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation. Connick v. Thompson, 563 U.S. 51, 60 (2011) (citing Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 692 (1978)). However, under Section 1983, local

governments are responsible only for "their own illegal acts" and may not be held "vicariously liable" for their employees' actions. Id. (citations omitted). Therefore, plaintiffs who seek to impose liability against local governments must prove that the "'action pursuant to official municipal policy' caused their injury." Id. Importantly, plaintiffs seeking recovery under Section 1983 must allege a "'constitutional injury,' that is, he or she must identify a deprivation of some federally secured right." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 55 (1st Cir. 2006) (citation omitted).

In the present case, the first Amended Complaint does not allege that J.R. himself was deprived of some federally secured right. Instead, the first Amended Complaint states that J.R. observed "Cappabianca's conduct" and that he "suffered a great deal of emotional distress by witnessing the officers beating his father, grandfather and mother." [Am. Compl. ¶¶ 100-01]. The law states that "[i]nsofar as plaintiffs attempt to make a federal cause of action out of their intentional infliction of emotional distress claim, it is clear that such a claim is not a substantive section 1983 cause of action." Daury v. Smith, No. CIV.A. 84-0314-F, 1987 WL 13807, at *8, aff'd in part, 842 F.2d 9 (1st Cir. 1988) (citing Robinson v. McCorkle, 462 F.2d 111, 114 (3d Cir. 1972), cert. denied, 409 U.S. 1042 (1972)). Because J.R. has failed to allege facts sufficient to establish the deprivation of a federal right, summary judgment is granted in Defendants' favor on Count XII as it relates to J.R. See Aponte-Torres, 445 F.3d at 55.

### 2. *Count XIII: Intentional Infliction of Emotional Distress*

As discussed above, Plaintiffs allege that J.R. "suffered a great deal of emotional distress by witnessing the officers beating his father, grandfather and mother." [Am. Compl. ¶ 101]. Under Massachusetts law, a claim of intentional infliction of emotional distress ("IIED") requires the plaintiff to prove that:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community"; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe."

Howell v. Enter. Publ'g Co., LLC, 920 N.E.2d 1, 28 (Mass. 2010) (citation modified) (citations omitted).

Here, the entirety of the allegations put forth by Plaintiffs is that J.R. suffered emotional distress caused by witnessing their family members being struck by police officers. [Am. Compl. ¶ 101; Pls. Resp. SOMF ¶¶ 124-25]. Notably missing are any allegations that either Cappabianca or Nunez "intended to inflict emotional distress." [See generally Am. Compl.; Pls. Resp. SOMF]. The Supreme Judicial Court of Massachusetts has emphasized that the focus of IIED claims has "been on the emotional distress of a person against whom the extreme and outrageous conduct was directed." Nancy P. v. D'Amato, 517 N.E.2d 824, 827 (Mass. 1988) (emphasis added). Because the Plaintiffs fail to allege that any of the officers' conduct was directed at J.R., this claim must fail. Moreover, Plaintiffs do not dispute that J.R. does not have any recollection of the events, and J.R. has indicated that he has never discussed the matter with anyone. [Pls. Resp. SOMF ¶¶ 124-25]. This is fatal. Thus, summary judgment must be granted in Defendants' favor on Count XIII as it relates to J.R.

### C.  Section 1983 Claims

"Section 1983 is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights[.]" Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). In order to succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law. Id. (citing Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir.

1997)). Vicarious liability is inapplicable to Section 1983 claims. <u>See</u> <u>Welch v. City of Biddeford Police Dep't</u>, 12 F.4th 70, 75-76 (1st Cir. 2021) ("Officers are not liable under § 1983 for the actions of other officers"). As such, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009).

### 1.    *Arrest Claims*

Rizzuti Sr., Rizzuti Jr., and Karissa each bring claims for false arrest under both Section 1983 (Counts I, II, and III, respectively) and state law (all three included in Count XI). The Fourth Amendment protects individuals from unreasonable seizures, including arrests made without probable cause. U.S. Const. amend. IV; <u>see</u> <u>Karamanoglu v. Town of Yarmouth</u>, 15 F.4th 82, 87 (1st Cir. 2021). To maintain a cause of action under Section 1983, a plaintiff must allege that they were being "depriv[ed] . . . of federally assured rights[.]" <u>Gagliardi</u>, 513 F.3d at 306. It is a "long settled principle" that the Fourth Amendment prohibits warrantless arrests not supported by probable cause. <u>Fraser v. Mass. Bay Transp. Auth.</u>, 544 F. Supp. 3d 148, 156-57 (D. Mass. 2021) (quoting <u>Prall v. City of Boston</u>, 985 F. Supp. 2d 115, 122 (D. Mass. 2013)).

"In assessing Section 1983 claims for false arrest, courts look to the law of the state in which the arrest occurred." <u>Bird v. City of New Bedford</u>, No. 17-12159-FDS, 2019 WL 4394914, at *4 (D. Mass. Sept. 13, 2019) (quoting <u>McLennon v. City of New York</u>, 171 F. Supp. 3d 69, 87 (E.D.N.Y. 2016)). Under Massachusetts law, officers must have "reasonable grounds" for making an arrest, a standard that "substantially overlap[s]" with the constitutional requirement of probable cause. <u>Santiago v. Fenton</u>, 891 F. 2d 373, 383 (1st Cir. 1989) (citations omitted). The existence of probable cause will defeat a false arrest claim. <u>Id.</u>

The state law tort of false imprisonment is closely connected to constitutional wrongful arrest claims. Waterman v. City of Taunton, 742 F. Supp. 3d 144, 154 (D. Mass. 2024) (citing Finamore v. Miglionico, 15 F.4th 52, 61 (1st Cir. 2021)). It requires a plaintiff to show that: "(1) the defendants intended to confine plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendants had no privilege to cause the confinement." Cabot v. Lewis, 241 F. Supp. 3d 239, 259 (D. Mass. 2017) (quoting Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 n.6 (1st Cir. 1995)). Although probable cause is not an element of a false arrest claim, its existence provides officers with privilege and thereby defeats such a claim. Santiago, 891 F. 2d at 383 ("[A]t the foundation of all the claims [including common law false arrest and Section 1983] is the necessity that the arrest be supported by probable cause."); Waterman, 742 F. Supp. 3d at 155 ("False imprisonment claims against police officers, therefore, rise and fall with the constitutional wrongful arrest analysis, at least insofar as both require probable cause."). Where an arrest is made without a warrant, as in this case, defendants bear the burden of proving justification. Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 564 (Mass. 2002).

Probable cause exists when the facts and circumstances known to the officer would lead a reasonable person to conclude that the individual had committed or was committing an offense. Bird, 2019 WL 4394914, at *4. This assessment is objective, focusing on the facts and circumstances available to the officer at the time of the arrest, and not on the officer's actual state of mind or subjective intent. Waterman, 742 F. Supp. 3d at 155. The exact degree of certainty required to establish probable cause is difficult to quantify, but it falls somewhere between bare suspicion and what would be needed to justify conviction. See Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003). Importantly, the evidence relied upon by police to establish probable cause need

not be "unassailably accurate." <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 80 (1st Cir. 2005) ("One who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom." (citation omitted)). Thus, law enforcement officials who reasonably but mistakenly conclude that probable cause exists are still entitled to immunity. <u>McDonald v. City of Boston</u>, 334 F. Supp. 3d 429, 439 (D. Mass. 2018). Nevertheless, on a motion for summary judgment, "[w]here 'there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them,' the existence of probable cause for an arrest is an issue for the jury; on the other hand, where the historical facts are established or undisputed, the issue becomes a mixed question of law and fact suitable for determination by the court." <u>Okosi v. Roby</u>, No. 1:21-cv-11884-IT, 2023 WL 3158915, at *3 (D. Mass. Apr. 28, 2023) (quoting <u>Nuon v. City of Lowell</u>, 768 F. Supp. 2d 323, 330 (D. Mass. 2011)).

It is worth noting that while the probable cause determination is an objective standard based on what a reasonable officer would have concluded under the circumstances, a plaintiff's subjective intent or understanding can still be relevant to the factual matrix that an officer confronts, to the extent it is objectively manifested. The objective standard means that an officer's subjective motivations or beliefs do not affect the probable cause analysis. <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). However, facts known to the officer at the time, including observable manifestations of plaintiff's intent or understanding, may properly inform the objective assessment of probable cause.

The Defendants argue that the Massachusetts District Court's partial denial of the Plaintiffs' motions to dismiss the criminal charges against them should be viewed as a judicial determination that probable cause existed for those charges. [ECF No. 40 at 19-20]. While the court dismissed the common law interference charges against the Plaintiffs, it allowed the remaining charges to proceed to trial. [Id. ¶¶ 111-13]. Ultimately, however, Plaintiffs were acquitted or had their charges dismissed. [Id. ¶¶ 113, 115]. The state court's ruling on the motions to dismiss does not definitively establish probable cause in this civil action. And, similarly, the fact that Plaintiffs were acquitted at a criminal trial does not necessarily mean that there was no probable cause to begin with. Indeed, a conviction requires a finding of proof beyond a reasonable doubt, a standard significantly higher than the burden of probable cause required for an arrest. See Gillis v. Chase, 894 F.3d 1, 3 (1st Cir. 2018) ("Nor does the acquittal—with conviction requiring the higher standard of proof beyond a reasonable doubt—establish that [defendant] lacked the requisite probable cause to support a charge against [plaintiff]."). Furthermore, the standard for deciding a motion to dismiss in a criminal case differs from the summary judgment standard in this civil rights case. The state court did not have before it all the evidence now in the record, including the deposition testimony of the parties. The ultimate acquittal of all plaintiffs on all charges further suggests that the evidence, when fully developed at trial, did not support the criminal charges. While the state court rulings are relevant, they are not dispositive on the issue of probable cause in this civil action.

The Court will now analyze the false arrest claims for each plaintiff separately.

a.    Rizzuti Sr.'s False Arrest Claims

The Court begins with Rizzuti Sr.'s false arrest claims against Cappabianca. Viewing the facts in the light most favorable to Rizzuti Sr., and drawing all reasonable inferences in his favor, the Court finds that there remain genuine issues of material fact.

The record shows that Rizzuti Sr. was arrested for disturbing the peace, disorderly conduct, assault and battery with a dangerous weapon (a door), assault and battery on a police officer, and interference with a police officer. [Pls. Resp. SOMF ¶ 104]. The interference charge was dismissed by the state court, but the remaining charges proceeded to trial, where Rizzuti Sr. was acquitted of all charges. [Id. ¶¶ 111, 115]. Defendants argue that probable cause existed for each of these charges, which would defeat Rizzuti Sr.'s false arrest claims under both Section 1983 and Massachusetts law. [ECF No. 40 at 19]. Rizzuti Sr., in turn, contends that the officers lacked probable cause and that his arrest was motivated by retaliation for his protected speech. Because the probable cause inquiry is based "upon whether the facts known at the time of the arrest objectively provided probable cause," United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005), "probable cause need only exist as to any offense that could be charged under the circumstance," LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 136 (D. Mass. 2007), aff'd, 550 F.3d 166 (1st Cir. 2008) (emphasis in original) (citation omitted); accord Smith v. Town of Barnstable, No. 19-cv-12305-RGS, 2021 WL 1408114, at *3 (D. Mass. Apr. 14, 2021) ("[S]o long as probable cause exists justifying an arrest for some offense, it is of no consequence that the basis stated by the arrested officer is legally invalid."). The Court will therefore determine whether the facts and circumstances known to Cappabianca at the time of the arrest objectively provided probable cause to arrest.

i.      Disturbing the Peace

Massachusetts law defines the offense of disturbing the peace as actions which "disturb the peace of the public, or some segment of the public, by actions, conduct or utterances, the combination of which constitute[s] a common nuisance." Commonwealth v. Basil B., 107 N.E.3d 1256, 2018 WL 3484558, at *2 (Mass. App. Ct. 2018) (quoting Commonwealth v. Federico, 876 N.E.2d 479, 483 (Mass. App. Ct. 2007)). Courts apply a two-pronged test to determine whether a person committed the offense. First, the person must engage in an activity which "most people would find to be unreasonably disruptive." Finamore, 15 F.4th at 59 (quoting Commonwealth v. Orlando, 359 N.E.2d 310, 312 (Mass. 1977)). And second, the activity must "in fact infringe [on] someone's right to be undisturbed." Id. Importantly, the First Circuit has emphasized that speech directed at police officers, even if loud or offensive, is generally protected by the First Amendment. Glik v. Cunniffe, 655 F.3d 78, 84 (1st Cir. 2011) ("In our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights."). Indeed, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." City of Houston v. Hill, 482 U.S. 451, 462-63 (1987). Thus, mere criticism of the police is not a crime. See id. at 461 ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); Brown v. Butler, No. 3:17-cv-30030-MAP, 2017 WL 9673712, at *8 (D. Mass. Dec. 22, 2017), report and recommendation adopted (Mar. 18, 2018), ECF No. 29.

Defendants argue that Rizzuti Sr.'s behavior provided probable cause for his arrest on charges of disturbing the peace. [ECF No. 40 at 19]. They contend that Rizzuti Sr. was "upset" and "yelling" in a manner that disturbed area citizens, drawing neighbors to their windows. [Pls.

Resp. SOMF ¶¶ 48, 54-56]. According to Defendants, Rizzuti Sr.'s actions created a public disturbance that justified his arrest. [ECF No. 40 at 19-20]. Defendants further argue that the Massachusetts District Court's denial of Rizzuti Sr.'s motion to dismiss these charges confirms the existence of probable cause. [ECF No. 40 at 33; SOMF ¶¶ 107, 110-11]. Rizzuti Sr. counters that his verbal criticism of Cappabianca was protected speech that did not rise to the level of disturbing the peace. He argues that he was merely expressing his opinion about the officers' conduct toward his daughter and granddaughter, and that his words alone did not create a public disturbance. [ECF No. 51 at 12-15].

The facts surrounding Rizzuti Sr.'s initial confrontation with the officers are largely captured on the Body Camera Footage. The footage shows that after Rachael J. Rizzuti drove away with her daughter, Rizzuti Sr. called Cappabianca a "tyrant." [Pls. Resp. SOMF ¶ 58; Body Camera Footage]. Cappabianca asked if Rizzuti Sr. was "done yelling, acting like a bigshot" and when told again to go inside, Rizzuti Sr. responded "no, you go on." [Pls. Resp. SOMF ¶ 59]. Cappabianca then told Rizzuti Sr. he was "about to be arrested for disturbing the peace." [Id. ¶ 61]. Rizzuti Sr. continued calling Cappabianca a "tyrant" and asked for a supervisor, at which point Cappabianca moved toward him to make an arrest. [Id. ¶¶ 62-63].

Viewing these facts in the light most favorable to Rizzuti Sr., a reasonable jury could find that Cappabianca lacked probable cause to arrest Rizzuti Sr. for disturbing the peace. The key factual dispute centers on whether Rizzuti Sr.'s conduct actually disturbed anyone other than the officers. Defendants claim that neighborhood residents were watching from their windows [Id. ¶ 56], which could suggest that Rizzuti Sr.'s conduct was disturbing enough to draw attention. However, Rizzuti Sr. testified that "while he personally did not see any neighborhood residents looking out of their windows, it would not surprise him if they were." [Id. ¶ 54]. Rizzuti Jr.

similarly testified that "he does not recall if he looked up to look at the neighborhood apartment windows and he did not make observations of anyone in windows watching." [Id. ¶ 55]. If the trier of fact were to credit the testimony of Rizzuti Sr. and Rizzuti Jr. over that of the officers, it could reasonably conclude that Rizzuti Sr.'s verbal criticism of Cappabianca, even if loud, did not "in fact infringe [on] someone's right to be undisturbed" as required for disturbing the peace. Finamore, 15 F.4th at 59 (citation omitted). In that case, Cappabianca would have lacked probable cause to arrest Rizzuti Sr. for this offense.

ii.    Disorderly Conduct

Massachusetts has adopted the definition of "disorderly" set forth in the Model Penal Code § 250.2, which provides that a person is guilty of disorderly conduct if:

> with the purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

Commonwealth v. Sholley, 739 N.E.2d 236, 242 n.7 (Mass. 2000). Massachusetts courts, however, have clarified and limited that definition, concluding that subsection (b) is constitutionally infirm and "[w]hat remains of the definition of 'disorderly' conduct is subsections (a) and (c) of § 250.2 of the Model Penal Code, with any application of subsection (c) restricted to cases not involving protest or other expressive activities." Sholley, 739 N.E.2d at 242; accord Philbrook v. Perrigo, 637 F. Supp. 2d 48, 54 (D. Mass. 2009). Thus, disorderly conduct in Massachusetts is limited to situations where a person "engages in fighting or threatening, or in violent or tumultuous behavior" or "creates a hazardous or physically offensive condition" in a non-expressive context. Sholley, 739 N.E.2d at 242 n.7; Philbrook, 637 F. Supp. 2d at 54.

Defendants argue that Cappabianca had probable cause to arrest Rizzuti Sr. for disorderly conduct based on his yelling and agitated behavior. [ECF No. 40 at 19-20]. They contend that a reasonable officer in Cappabianca's position could have believed that Rizzuti Sr.'s conduct was sufficiently disruptive to constitute disorderly conduct under Massachusetts law. Viewing the evidence in the light most favorable to Rizzuti Sr., the Court finds a genuine dispute of material fact as to whether Cappabianca had probable cause to arrest Rizzuti Sr. for disorderly conduct. The video does not clearly establish that Rizzuti Sr. was engaged in "fighting or threatening, or in violent or tumultuous behavior" under subsection (a). See Sholley, 739 N.E.2d at 242. His actions, as captured on video, consisted primarily of verbal criticism directed at Cappabianca. [See generally Body Camera Footage]. Merely remonstrating with an officer in connection with a stop, or even directing profanities at police, is not enough to constitute disorderly conduct. See Waterman, 742 F. Supp. 3d at 159 ("Offensive and abusive speech does not, without more, give an officer probable cause to arrest someone for disorderly conduct." (citing Veiga v. McGee, 26 F.3d 1206, 1213 (1st Cir. 1994); Glik, 655 F.3d at 84)). Furthermore, to the extent Rizzuti Sr.'s conduct could be characterized as creating a "physically offensive condition" under subsection (c), his speech criticizing police action would likely fall within the expressive activity exception to that subsection. See Sholley, 739 N.E.2d at 242. A reasonable jury could therefore find that Cappabianca lacked probable cause to believe that Rizzuti Sr.'s conduct satisfied either of the subsections of the disorderly conduct statute.

iii.    Assault and Battery with a Dangerous Weapon

The crime of assault and battery with a dangerous weapon, in violation of Mass. Gen. Laws ch. 265, § 15A, requires "that the elements of assault be present, that there be a touching, however slight, that that touching be by means of the weapon, and that the battery be accomplished by use

of an inherently dangerous weapon, or by use of some other object as a weapon, with the intent to use that object in a dangerous or potentially dangerous fashion." Commonwealth v. Cruzado, 901 N.E.2d 1245, 1249 (Mass. App. Ct. 2009) (quoting Commonwealth v. Appleby, 402 N.E.2d 1051, 1058 (Mass. 1980)).

Defendants argue that Cappabianca had probable cause to arrest Rizzuti Sr. for assault and battery with a dangerous weapon when, according to Defendants, Rizzuti Sr. swung the door which struck Cappabianca. [Pls. Resp. SOMF ¶¶ 66-69; ECF No. 40 at 19-20]. They contend that this provided probable cause for this charge. Rizzuti Sr., however, disputes that he intentionally struck Cappabianca with the door. [ECF No. 51 at 22-23; Pls. Resp. SOMF ¶ 68]. He testified that he "could not recall if he tried to shut the door after he ran through it and does not know if it struck Cappabianca." [Pls. Resp. SOMF ¶ 68]. The testimony of other witnesses is mixed. Cappabianca claims that "the door, when it was swung by Rizzuti, Sr., did strike Cappabianca." [Id. ¶ 69]. Another witness, Laurie Buckland, testified that she "saw Rizzuti, Sr. enter the [C]hurch first through what was a closed door; Rizzuti, Sr. was running and, after he entered the door, he 'swung it' behind him and kept moving forward." [Id. ¶ 67]. However, in her deposition, Buckland clarified that she "d[idn't] know if it completely closed, though . . . . I don't know that it actually latched." [Id. ¶ 67].

This conflicting evidence creates a genuine dispute of material fact as to whether Officer Cappabianca had probable cause to arrest Rizzuti Sr. for assault and battery with a dangerous weapon. Probable cause for this charge would require a reasonable belief that Rizzuti Sr. intentionally used the door as a weapon against Officer Cappabianca. Given Rizzuti Sr.'s testimony that he could not recall if the door struck Officer Cappabianca, and Buckland's unclear testimony about whether the door fully closed, a reasonable jury could find that Officer

Cappabianca lacked probable cause to believe that Rizzuti Sr. intentionally used the door as a weapon. Alternatively, the jury could credit Officer Cappabianca's version of events and find that he reasonably believed Rizzuti Sr. had intentionally struck him with the door, establishing probable cause for this charge.

### iv.    Assault and Battery on a Police Officer

A valid claim of assault and battery requires the "intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." Commonwealth v. Ferreira, 248 N.E.3d 679, 2024 WL 5002123, at *4 n.3 (Mass. App. Ct. 2024), review denied, 255 N.E.3d (2025) (citation omitted). In order to establish assault and battery on a police officer, it must also be proven that the officer was "engaged in the performance of his duties at the time [of such assault and battery] and the defendant [knew] that the victim was an officer engaged in the performance of his duties." Commonwealth v. Tyson, 244 N.E.3d 508, 512-13 (Mass. App. Ct. 2024) (alterations in original) (quoting Commonwealth v. Moore, 632 N.E.2d 1234, 1238 (Mass. App. Ct. 1994)).

Defendants argue that Cappabianca had probable cause to arrest Rizzuti Sr. for assault and battery on a police officer based on two incidents: (1) when Rizzuti Sr. allegedly struck Cappabianca with the door, and (2) when Rizzuti Sr. actively resisted being handcuffed inside the Church. [Pls. Resp. SOMF ¶¶ 66-69, 72-73, 81-84; ECF No. 40 at 19-20]. They contend that this resistance included interlocking his arms beneath him and swinging his leg to prevent being rolled over. [Pls. Resp. SOMF ¶¶ 73, 84]. First, with respect to the door incident, the same factual dispute discussed above applies here. If the jury were to find that Rizzuti Sr. did not intentionally strike Cappabianca with the door, or that Cappabianca lacked a reasonable basis to believe he had done so intentionally, then this incident would not provide probable cause for assault and battery on a

police officer. As for Rizzuti Sr.'s actions inside the Church, the video shows that when Cappabianca caught up to him, Rizzuti Sr. was brought to the ground. [Id. ¶ 72; Body Camera Footage]. The video then shows Rizzuti Sr. with "his arms . . . in an interlocked position under his head" while an officer orders him to put his hands behind his back. [Pls. Resp. SOMF ¶ 73]. Later, the video shows Cappabianca trying to roll Rizzuti Sr. over, and "Rizzuti Sr. can be seen continuing his resistance by swinging his right leg in the opposite direction to thwart Cappabianca's attempt to roll him." [Id. ¶ 84].

This evidence, viewed in the light most favorable to Rizzuti Sr., creates a genuine dispute of material fact as to whether Cappabianca had probable cause to arrest Rizzuti Sr. for assault and battery on a police officer based on his resistance. While the video does show Rizzuti Sr. resisting being handcuffed, the legal significance of this resistance depends in part on whether the initial attempt to arrest him was lawful. If a jury were to find that Cappabianca lacked probable cause to arrest Rizzuti Sr. for disturbing the peace or disorderly conduct, they could also conclude that Rizzuti Sr.'s resistance was lawful under Massachusetts law, which recognizes a limited right to resist an unlawful arrest. See Commonwealth v. Moreira, 447 N.E.2d 1224, 1227-28 (Mass. 1983). Moreover, as Rizzuti Sr. points out, he was "not told he was under arrest or instructed to submit to restraint" prior to this resistance. [Pls. Resp. SOMF ¶ 84]. This creates a factual question as to whether Cappabianca had probable cause to believe Rizzuti Sr.'s resistance constituted an intentional assault and battery rather than a reflexive or defensive action.

v.    Conclusion on Rizzuti Sr.'s False Arrest Claims

For the foregoing reasons, genuine disputes of material fact exist regarding whether Cappabianca and Nunez had probable cause to arrest Rizzuti Sr. for any of the charged offenses. These factual disputes include whether Rizzuti Sr.'s conduct provided probable cause for

disturbing the peace, engaging in disorderly conduct, whether he intentionally struck Cappabianca with the door, and whether his resistance inside the Church provided probable cause for assault and battery on a police officer. Because the existence of probable cause is a central element in determining the lawfulness of an arrest, these factual disputes preclude summary judgment on Rizzuti Sr.'s false arrest claims under both Section 1983 and Massachusetts law.[16] Defendants' motion for summary judgment on these claims is therefore denied.

### b.    Rizzuti Jr.'s False Arrest Claims

Rizzuti Jr. was arrested for common law interference with a police officer and resisting arrest. [Pls. Resp. SOMF ¶ 105]. The Massachusetts District Court dismissed the interference charge upon motion, but allowed the resisting arrest charge to proceed to trial. [Id. ¶ 112]. Ultimately, Rizzuti Jr. was acquitted of the resisting charge. [Id. ¶ 115]. The Court will analyze each charge in turn.

### i.    Interference with a Police Officer

Under Massachusetts common law, interfering with a police officer requires proof that (1) an offer was engaged in the lawful performance of an official duty, (2) the defendant physically obstructed or interfered with that performance, (3) the defendant was aware that the officer was

---

[16] Rizzuti Sr. also alleges that his arrest was motivated by retaliation for protected First Amendment speech and that Nunez failed to intervene in Cappabianca's allegedly excessive use of force (Count I). Regarding the First Amendment claim, the Supreme Court has held that plaintiffs must generally show an absence of probable cause to maintain a retaliatory arrest claim. Nieves v. Bartlett, 587 U.S. 391, 402 (2019); see Torres v. City of Manchester, No. 22-cv-93-JL, 2022 WL 17157028, at *7 (D.N.H. Oct. 14, 2022), report and recommendation adopted, 2022 WL 17131320 (Nov. 21, 2022); Boudreau v. Petit, No. 17-301 WES, 2024 WL 665546, at *12 (D.R.I. Feb. 16, 2024). Because there remain genuine disputes of material fact regarding probable cause for Rizzuti Sr.'s arrest, see supra, summary judgment is likewise inappropriate on his First Amendment retaliation claim. As for the failure to intervene claim against Nunez, the record shows that "once Rizzuti, Sr. went to the ground, Nunez almost immediately left the area to deal with Rizzuti, Jr." [ECF No. 40 at 18 n.9; see SOMF ¶¶ 76-77]. Given this evidence, Rizzuti Sr. cannot establish that Nunez had a "realistic opportunity" to intervene in any alleged excessive force by Cappabianca. See Gaudreault v. Mun. of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990) ("A police officer cannot be held liable for failing to intercede if he has no 'realistic opportunity' to prevent an attack."). Plaintiffs do not argue otherwise. Accordingly, summary judgment is granted as to Rizzuti Sr.'s failure to intervene claim against Nunez.

engaged in the performance of that duty, and (4) the defendant intended to obstruct or hinder the officer. Commonwealth v. Adams, 125 N.E.3d 39, 53 (Mass. 2019).

Defendants argue that Nunez had probable cause to arrest Rizzuti Jr. for interference with a police officer when Rizzuti Jr. positioned himself in close physical proximity to the officers as they were attempting to arrest Rizzuti Sr. [Pls. Resp. SOMF ¶ 75; ECF No. 40 at 19-20]. Defendants contend that "[t]hat physical movement was inherently threatening to the officers and was enough to pass the low threshold of probable cause for common law interference with a police officer. [ECF No. 40 at 19-20]. Rizzuti Jr. disputes that his actions constituted interference, arguing that he was merely questioning the officers' conduct toward his father and was not physically interfering with the arrest. [See ECF No. 51 at 2]. He also notes, as discussed above, that the state court dismissed this charge on upon a motion to dismiss, suggesting that the court found insufficient evidence to support the charge. [Pls. Resp. SOMF ¶ 112]. Nevertheless, the Court will not credit the dismissal of the charge as a conclusive determination of probable cause, or the lack thereof, for purposes of this action. See supra.

The record establishes several key facts without substantial dispute. After Rizzuti Sr. fled into the Church and the officers pursued him, Rizzuti Jr. also entered the Church. According to Karissa's testimony, "as Joseph Rizzuti, Sr. was on the ground, Joseph Rizzuti, Jr. had made his way within a foot or two of that arrest and was yelling 'what are you doing.'" [Pls. Resp. SOMF ¶ 75]. Indeed, Rizzuti Jr. conceded that "he was within arm's reach of his father's arrest." [Id.]. Nunez testified that he "had turned toward Rizzuti, Jr., an individual that had run with officers who were chasing Rizzuti, Sr. and was in close proximity to the officers doing what Nunez perceived to be interfering or attempting to interfere with the arrest of Rizzuti, Sr." [Id. ¶ 77]. Nunez further

testified that "after Rizzuti, Jr.'s actions concerning the arrest of Rizzuti, Sr., he tried to take control of Rizzuti, Jr.'s arm but Rizzuti, Jr. pulled backwards." [Id. ¶ 79].

Based on these undisputed facts, Nunez had probable cause to arrest Rizzuti Jr. for interference with a police officer. As an initial matter, Rizzuti Jr. conceded that he positioned himself within arm's reach of officers who were attempting to arrest his father. [Pls. Resp. SOMF ¶ 75]. This physical positioning constituted the "physical act that obstruct[ed] or hinder[ed]" the officers' performance of their duties. See Adams, 125 N.E.3d at 52-53. By placing himself in such proximity to an ongoing arrest, Rizzuti Jr. created a situation where the officers would need to be concerned about his actions and potentially adjust their tactics to account for his presence, thereby hindering their ability to complete the arrest of Rizzuti Sr. Moreover, the fact that Rizzuti Jr. was yelling "what are you doing?" while positioning himself so close to the arrest demonstrated his awareness that the officers were engaged in an arrest. Additionally, both of Rizzuti Jr.'s actions could also be reasonably interpreted as an intention to obstruct or hinder the officers' duties. A reasonable officer in Nunez's position could therefore believe that Rizzuti Jr.'s close physical proximity, combined with his verbal questioning of the officers' actions, constituted interference with the arrest in progress.[17] Accordingly, Defendants are entitled to summary judgment as to Rizzuti Jr.'s false arrest claim.[18] While Nunez may also have had probable cause to arrest Rizzuti Jr. for other crimes, including resisting arrest, the Court need not address those charges here. See LaFrenier, 478 F. Supp. 2d at 136 ("probable cause need only exist as to any offense that could be

---

[17] The record also establishes that Rizzuti Jr. engaged in additional conduct that supported probable cause for this charge. According to Nunez's testimony, which Plaintiffs do not dispute in their statement of additional material facts, Rizzuti Jr. was "hovering" near the officers, Nunez "pushed Rizzuti, Jr. back, told him to stop," and Rizzuti Jr. "took a fighting stance with him (he bladed his body a little bit), almost like if he wanted to box." [SAMF ¶ 35]. This evidence further supports a finding that Nunez had probable cause to arrest Rizzuti Jr. for interference with a police officer.

[18] To the extent Rizzuti Jr. alleges that his arrest was motivated by retaliation for protected First Amendment speech, summary judgment is similarly appropriate because, as discussed supra, the existence of probable cause is fatal to the claim. See Bartlett, 587 U.S. at 402; supra note 16.

charged under the circumstance[.]") (emphasis in original) (citation omitted); <u>Thomas v. City of Boston</u>, No. 1:21-cv-10596-IT, 2022 WL 17671919, at *7, 7 n.11 (D. Mass. Dec. 14, 2022).

c.    Karissa's False Arrest Claims

Karissa was arrested for common law interference with a police officer. [Pls. Resp. SOMF ¶ 106]. While the parties again present conflicting accounts of her actions, they agree at least on certain baseline facts: after Rizzuti Jr. was handcuffed, Nunez began searching him and removing items from his pockets. [<u>Id.</u> ¶¶ 86, 92]. Karissa bent down to pick up these items. [<u>Id.</u> ¶ 92]. Karissa admits that when she saw the officer "toss items nearby, her response was to bend down and pick them up." [<u>Id.</u>].

Probable cause is an objective standard that focuses on the facts and circumstances available to the officer at the time of the arrest and not the officer's subjective intent or actual state of mind. <u>Waterman</u>, 742 F. Supp. 3d at 155 (quoting <u>Maryland v. Macon</u>, 472 U.S. 463, 470-71 (1985)). As such, the relevant question is whether, from an objective perspective, a reasonable officer in Nunez's position would have had probable cause to believe Karissa was interfering with police procedure by taking items from an ongoing search incident to arrest. The elements of interference with a police officer include: (1) a police officer engaged in the lawful performance of an official duty, (2) a physical act that obstructed or interfered with that performance, (3) awareness that the officer was engaged in an act, and (4) an intention to obstruct or to hinder. <u>Adams</u>, 125 N.E.3d at 53.

The undisputed facts establish that Karissa physically took items that Nunez had removed during a search incident to arrest. [Pls. Resp. SOMF ¶ 92]. This physical act objectively interfered with Nunez's lawful performance of a search incident to arrest. A search incident to arrest is a well-established police procedure, and a reasonable officer would understand that interference

33

with that procedure could constitute the offense interfering with a police officer. While Karissa testified that she "did not know the officer's purpose for doing so," [id.], this subjective lack of knowledge is not relevant to the probable cause determination unless there were observable manifestations of this innocent intent that would have been apparent to a reasonable officer. The SJC has explained that interference with a police officer requires an "intent[ion] to obstruct or hinder," Adams, 125 N.E.3d at 53, but from an objective standpoint, that intent can be inferred from one's actions.

At summary judgment, the non-moving party bears the burden of identifying specific evidence in the record that demonstrates a genuine dispute of material fact. See Garside, 895 F.2d at 48; Anderson, 477 U.S. at 257. Plaintiffs have not identified evidence of observable factors that would have indicated to Nunez that Karissa lacked the intent to interfere. The record contains no evidence about how Karissa approached the items, her demeanor when reaching for them, whether she appeared to be secreting them away or openly handling them, or whether she verbally explained her actions or asked permission before taking them. Without evidence of such observable manifestations of innocent intent, the only fact a reasonable office in Nunez' position could perceive was that during an ongoing search incident to arrest, Karissa was physically taking items that had been removed as part of the search. [Pls. Resp. SOMF ¶ 92]. This action objectively constitutes interference with a police procedure.

Moreover, as discussed in further detail above, the state court's dismissal of the interference charge against Karissa, [Pls. Resp. SOMF ¶ 113; SAMF ¶ 143], does not create a genuine issue of material fact regarding probable cause at the time of the arrest. A court's dismissal of charges does not conclusively establish lack of probable cause at the time of arrest. And, the

34

state court's ruling was made with a different legal standard and potentially different evidence than is before this Court.

While contradicting accounts of what happened after Karissa picked up the items—with Karissa claiming Nunez struck her with sufficient force to knock her down, [Pls. Resp. SOMF ¶ 92-93], and Nunez claiming he pushed her forward, [SAMF ¶ 36]—present factual disputes, these events occurred after the interference had already taken place. These disputes about the force used during arrest do not create a genuine dispute of material fact as to whether probable cause existed for the arrest itself.

Viewing the undisputed facts objectively, a reasonable officer in Nunez's position would have had probable cause to believe that Karissa was interfering with the search incident to arrest when she physically took items that had been removed during that search. [Pls. Resp. SOMF ¶ 92]. The record contains no evidence from which a reasonable juror could conclude that objectively observable factors would have indicated to Nunez that Karissa lacked the intent to interfere. Accordingly, summary judgment is appropriate on Karissa's false arrest claims.

### 2. *Force Claims*

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010). Excessive force claims are evaluated under the Fourth Amendment's "objective reasonableness" standard, whereby "a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances." Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)). Considerations that may bear on the reasonableness of the force use include, but are not limited to, "the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively

resisting." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (citing Graham, 490 U.S. at 396); accord Raiche, 623 F.3d at 36.

The standard is objective and fact specific. See Graham, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). In weighing these factors, "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Kenney, 700 F.3d at 609 (quoting Graham, 490 U.S. at 396-97) (citations omitted); see Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009) ("By definition, excessive force is unreasonable force. But reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force.").

The First Circuit has suggested that courts should analyze each use of force in an excessive force separately using a "segmented approach," particularly when "circumstances relevant to the reasonableness inquiry changed between one use of force and another." Lachance v. Town of Charlton, 990 F.3d 14, 25 (1st Cir. 2021); see County of Los Angeles v. Mendez, 581 U.S. 420, 428 (2017) ("[T]he objective reasonableness analysis must be conducted separately for each . . . seizure that is alleged to be unconstitutional."). The First Circuit cautioned, however, that its ruling did not mean that "after segmenting the uses of force and assessing each as reasonable, a court could not thereafter look at the totality of the uses of force and determine that there was a constitutional violation." Penate v. Sullivan, 73 F.4th 10, 22 n.9 (1st Cir. 2023) (quoting Lachance, 990 F.3d at 25 n.10) (citation omitted).

As to Plaintiffs' state law claims, Massachusetts law allows for assault and battery claims against law enforcement officers who employ excessive force during an arrest. Raiche, 623 F.3d at 40 (citing Powers v. Sturtevant, 85 N.E. 84, 84 (Mass. 1908)). As with Section 1983 excessive force claims, "reasonable force is a valid defense to assault and battery." Id. (citing Dean v. City of Worcester, 924 F.2d 364, 369 (1st Cir. 1991)). And, "[w]here a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims." Id. Because Plaintiffs set forth both types of claims, the analysis of their common law claims for assault and battery collapse into our analysis of their Section 1983 excessive force claims.

a.    Rizzuti Sr.'s Force Claims

Defendants argue that the force used against Rizzuti Sr. was reasonable because he was actively resisting arrest after fleeing from officers, striking Cappabianca with a door, and physically resisting being handcuffed. [ECF No. 40 at 22-23]. They contend that Cappabianca's actions, including bringing Rizzuti Sr. to the ground and using a Taser in drive-stun mode, were appropriate responses to Rizzuti Sr.'s resistance. [Id.]. Plaintiffs counter that the level of force used was excessive given the circumstances, particularly the use of the Taser without warning while Rizzuti Sr. was already subdued on the ground. [ECF No. 51 at 19-20]. Applying the segmented approach endorsed by the First Circuit, the Court will now turn to analyze the different uses of force against Rizzuti Sr. separately, as the circumstances changed throughout the encounter. See Lachance, 990 F.3d at 25.

i.     Initial Takedown

The record shows that after Rizzuti Sr. was yelling on the sidewalk following the departure of his daughter Rachael in a vehicle, Cappabianca told him that he was about to be arrested for disturbing the peace. [Pls. Resp. SOMF ¶ 61]. As Cappabianca advanced toward him, Rizzuti Sr. fled into the Church building. [Id. ¶¶ 63-64]. During his flight, Rizzuti Sr. swung a door that struck Cappabianca. [Id. ¶¶ 67-69]. The officers pursued Rizzuti Sr. into the Church, where he slipped and fell near the altar. [Id. ¶¶ 70-71]. While Rizzuti Sr. was attempting to regain his balance, Cappabianca and Nunez caught up to him and brought him to the ground. [Id. ¶ 72].

First, with respect to the severity of the crime, there are no material disputed facts. The record establishes that Cappabianca told Rizzuti Sr. he was about to be arrested for disturbing the peace. [Id. ¶ 61]. It is also undisputed that Rizzuti Sr. then fled from the officer. [Id. ¶¶ 63-64]. While Rizzuti Sr. testified that he did not believe Cappabianca was advancing to arrest him but rather to fight, [id. ¶ 65], this subjective belief does not create a genuine dispute of material fact about what occurred. The objective record shows that Cappabianca had told Rizzuti Sr. he was about to be arrested, and Rizzuti Sr. then began to back away. It is also undisputed that Rizzuti Sr. swung a door that struck Cappabianca during his flight. [Id. ¶¶ 67-69]. While Rizzuti Sr. testified that he could not recall if he tried to shut the door or if it struck Cappabianca, [id. ¶ 68], his uncertainty does not create a genuine dispute given Cappabianca's testimony that the door did strike him, [id. ¶ 69], and a witness's testimony that Rizzuti Sr. "swung" the door behind him as he entered the Church. [Id. ¶ 67]. The progression from disturbing the peace to evading arrest and striking an officer with a door is significant because it shows an escalation from a relatively minor offense to more serious crimes. The severity of these crimes, while perhaps not the most serious in the criminal code, is relevant to the reasonableness analysis because it informs the officers'

perception of the situation and the potential threat posed by Rizzuti Sr. This factor weighs in favor of finding the initial takedown reasonable.

Concerning the second <u>Graham</u> factor—whether Rizzuti Sr. posed an immediate threat to officer safety—there are again no genuine disputes of material fact. The undisputed facts show that Rizzuti Sr. had already swung a door closed, which ultimately struck Cappabianca, [<u>id.</u> ¶¶ 67-69], demonstrating a willingness to use physical means to evade arrest. He had fled into a church building where other people were present, [<u>id.</u> ¶¶ 63-64, 70], creating an unpredictable situation for the officers. His flight into an enclosed space with bystanders present increased the potential danger to both officers and others, as the officers had not way of knowing whether Rizzuti Sr. might attempt to obtain a weapon, use other objects as weapons, or incite others to interfere with the arrest. While Plaintiffs may argue that Rizzuti Sr. did not pose a significant threat because he was merely trying to reach his office, [<u>id.</u> ¶ 70], this subjective intention—even if credited—does not negate the objective threat posed by his actions from the perspective of a reasonable officer on the scene. The fact that Rizzuti Sr. had already struck an officer, regardless of whether it was intentional, and was fleeing into an enclosed public space would reasonably lead officers to perceive him as posing a threat. This factor also weighs in favor of finding the initial takedown reasonable.

As to the third factor—whether Rizzuti Sr. was actively resisting arrest or attempting to evade arrest by flight—the record in unequivocal. It is undisputed that when Cappabianca informed Rizzuti Sr. that he was about to be arrested for disturbing the peace and advanced toward him, Rizzuti Sr.'s response was to flee into the Church building. [<u>Id.</u> ¶¶ 61, 63-64]. Rizzuti Sr. himself testified that he ran when Cappabianca approached him. [<u>Id.</u> ¶ 65]. While inside the Church, Rizzuti Sr. continued his attempt to evade the officers, and it was only when he slipped

and fell that the officers were able to catch up to him. [Id. ¶¶ 70-72]. This active evasion of arrest by flight weighs heavily in favor of finding the initial takedown reasonable.

In this case, all three Graham factors weigh in favor of finding the initial takedown of Rizzuti Sr. reasonable. The undisputed facts show that he had committed increasingly serious offenses, posed a threat to officer safety by striking an officer and fleeing into a crowded space, and was actively evading arrest by flight. Under these circumstances, the officers' use of force to bring Rizzuti Sr. to the ground after he had slipped and fallen was objectively reasonable. See Kenney, 700 F.3d at 609-10 (finding that use of "some degree of physical coercion" to effect an arrest is reasonable when a suspect is attempting to evade arrest); LaFrenier, 478 F. Supp. 2d at 138 (finding that use of force was reasonable when officers were confronted with suspect who committed assault and battery on police officer and was resisting arrest). Defendants are therefore entitled to summary judgment as to this use of force.

### ii.    Use of Taser

Once Rizzuti Sr. was on the ground, the circumstances changed significantly. The record shows that Rizzuti Sr.'s arms were in an interlocked position under his head. [Pls. Resp. SOMF ¶ 73]. The Body Camera Footage shows Cappabianca attempting multiple times to secure Rizzuti Sr.'s left hand, without success. [Id. ¶ 81; Body Camera Footage]. Specifically, Cappabianca can be seen trying to get Rizzuti Sr.'s left hand behind his back, and Rizzuti Sr. can be seen resisting that attempt. [Pls. Resp. SOMF ¶ 81]. Cappabianca is then heard telling Rizzuti Sr. to put his hands behind his back. [Id. ¶ 81; Body Camera Footage].[19] Cappabianca then makes additional attempts to secure Rizzuti Sr.'s left hand without success. [Pls. Resp. SOMF ¶ 81]. After these unsuccessful

---

[19] While Plaintiffs dispute that Cappabianca ever ordered Rizzuti Sr. to put his hands behind his back, a review of the Body Camera Footage reveals that Cappabianca issued the order at least twice. [See Body Camera Footage at 1:17, 1:45].

attempts, Cappabianca used his Taser in drive-stun mode. [Pls. Resp. SOMF ¶ 82]. The use of the Taser resulted in Rizzuti Sr. producing his hands, after which he was handcuffed. [Id.; SAMF ¶ 18].

Regarding the first Graham factor—the severity of the crime—the relevant offense at this moment was Rizzuti Sr.'s continued resistance to the officers' attempts to handcuff him. This is a significant offense because it directly undermines law enforcement's ability to perform their duties safely and effectively. While Rizzuti Sr. disputes ever hearing Cappabianca's commands to produce his hands behind his back to be handcuffed, [Pls. Resp. SOMF ¶¶ 73, 81, 84; SAMF, Ex. 5 (Rizzuti Sr. Dep.) at 115:19-22, 123:19-22], he does not dispute refusing to be handcuffed, [Pls. Resp. SOMF ¶ 81 (admitting that Body Camera Footage shows unsuccessful attempts by Cappabianca to control Rizzuti Sr.'s arms)]. It was thus objectively reasonable for Cappabianca to exert a modicum of force to secure Rizzuti Sr. See Graham, 490 U.S. at 396 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

The second factor—whether Rizzuti Sr. posed an immediate threat to officer safety the moment the Taser was deployed—weighs against the use of force. Viewing the evidence in the light most favorable to Plaintiffs, Rizzuti Sr. was prone on the ground with officers on top of him, and his arms were visibly positioned under this head, not concealed in a threatening manner. [SAMF ¶ 50; Body Camera Footage]. A reasonable factfinder could conclude that Rizzuti Sr., while on the ground with officers on top of him, did not pose an immediate threat to officer safety that would justify the use of a Taser.

The third factor—whether Rizzuti Sr. was actively resisting arrest at the time the Taser was used—weighs in favor of Defendants. As mentioned above, while the Body Camera Footage

shows Rizzuti Sr.'s failure to comply with commands to place his hands behind his back, Rizzuti Sr. testified that he "never" heard either officer speak to him while he was on the floor. [Pls. Resp. SOMF ¶ 73]. This directly contradicts the assertion that Rizzuti Sr. was consciously resisting commands to place his hands behind his back. A review of the Body Camera Footage, however, clearly demonstrates that Cappabianca ordered Rizzuti Sr. to put his arms behind his back at least twice. [Body Camera Footage at 1:17, 1:45]. If Rizzuti Sr. did not hear the commands, his failure to comply would not constitute resistance but rather a lack of awareness of what was being asked of him. Second, the parties dispute whether Rizzuti Sr. received any warning before the Taser was deployed. While Rizzuti Sr. maintains that he was tased without warning, [SAMF ¶ 51], Cappabianca claimed that he thought he heard his voice in his Body Camera Footage warning Rizzuti Sr. to put his hands behind his back or he would be tased, [id. ¶ 18]. In any event, the reasonableness inquiry is objective and must be determined in light of the facts and circumstances that Cappabianca faced at the time. See Kenney, 700 F.3d at 609. Even if Rizzuti Sr.'s statements that he did not hear Cappabianca issue a warning are credited, the fact remains that Rizzuti Sr. resisted by continuously failing to produce his hands for handcuffing. [Pls. Resp. SOMF ¶ 81]. Moreover, Rizzuti Sr.'s resistance was consistent with his defiance throughout the encounter: he yelled at the officers, potentially obstructing their investigation and he ran away from Cappabianca, shutting a door behind him that ultimately struck an officer in pursuit. Indeed, a reasonable officer would be justified, and perhaps even obligated, to consider Rizzuti Sr.'s prior conduct in assessing whether his refusal to surrender his arms posed an immediate danger, including the prospect of an escalation in his resistance.

The majority of the Graham factors weigh in favor of finding the use of the Taser reasonable. The undisputed facts show that Rizzuti Sr. resisted Cappabianca's efforts to handcuff

him, threatening the officers' safety and potentially others in the building. In light of Rizzuti Sr.'s earlier attempts to evade arrest by flight, Cappabianca's deployment of his Taser in drive stun mode to aid in the arrest was objectively reasonable. See Gray v. Cummings, 917 F.3d 1, 13 (1st Cir. 2019) ("[R]espectable authority suggests that refusing to be handcuffed constitutes active resistance and may justify the use of a Taser."). Summary judgment is therefore appropriate in Defendants' favor with respect to Cappabianca's Taser deployment.

### iii.    Post-Handcuffing Force

According to Defendants, after Rizzuti Sr. was tased and handcuffed, he continued to resist by swinging his right leg when officers attempted to roll him over. [SOMF ¶ 84]. Specifically, the Body Camera Footage shows Cappabianca trying to roll Rizzuti Sr. over, and Rizzuti Sr. can be seen "continuing his resistance by swinging his right leg in the opposite direction to thwart Cappabianca's attempt to roll him." [SOMF ¶ 84; Body Camera Footage at 3:09-3:19]. Rizzuti Sr., however, disagrees with the characterization that he resisted, claiming instead that he intended to remain prone face down rather than be rolled onto his back and on top of his handcuffed arms and hands. [Pls. Resp. SOMF ¶ 84].

First, regarding the severity of the crime, while there is a dispute about whether Rizzuti Sr. resisted Cappabianca's attempt to roll him—a dispute about Rizzuti Sr.'s subjective intent— objectively his actions constituted resistance to the officers' attempts to position him. Even if Rizzuti Sr. was merely trying to avoid a painful position rather than intentionally resist arrest, from an objective standpoint, his actions still impeded the officers' ability to complete the arrest process. See Kenney, 700 F.3d at 609 ("Courts assess the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene[.]'" (quoting Graham, 490 U.S. at 396-97)). From the officers' perspective, Rizzuti Sr. swinging his leg would reasonably be perceived as

resistance. However, this type of resistance would generally be considered less severe than his previous actions of fleeing and resisting handcuffing.

Second, whether Rizzuti Sr. posed an immediate threat to officer safety after being handcuffed, the record does not suggest that he presented any significant threat. From an objective perspective, a swinging leg from a handcuffed suspect could potentially pose some risk to officer safety. While the parties dispute whether Rizzuti Sr. swung his leg in a manner that could reasonably be perceived as threatening, the potential threat must be viewed in context from the perspective of a law enforcement officer at the scene. At this point, however, Rizzuti Sr. was already handcuffed and prone on the ground and he therefore posed a diminished threat. See Patino v. City of Revere, No. 13-cv-11114-LTS, 2016 WL 880975, at *5 (D. Mass. Mar. 8, 2016) ("Once an individual is apprehended and handcuffed there is no longer a need for use of force and beating a person while in the control of the police would unquestionably be excessive force."). Thus, this factor weighs against finding the post-handcuffing force reasonable.

Third, as to whether Rizzuti Sr. was actively resisting arrest after being handcuffed, the record indicates that, from an objective standpoint, Rizzuti Sr. was offering some resistance to the officers' attempts to reposition him. Regardless of his subjective intent, see Kenney, 700 F.3d at 609, his swinging leg interfered with the officers' actions and prevented them from completing the arrest and securing the scene. While this resistance was less substantial than his earlier flight and resistance to handcuffing, it still constitutes a form of resistance to lawful police demands. See United States v. Dancy, 640 F.3d 455, 470 (1st Cir. 2011) ("[T]he use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." (quoting Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002)). Once a suspect has been handcuffed and brought under control, the use of force should decline

accordingly. See Smith v. City of Holyoke, No. 17-30078-FDS, 2020 WL 1514610, at *9 (D. Mass. Mar. 30, 2020) ("[I]t is unreasonable to use significant physical force upon a non-resisting, compliant person[.]" (emphasis added) (collecting cases)). Here, although Rizzuti Sr. was handcuffed, from the officers' objective perspective, his actions were inconsistent with that of a "non-resisting, compliant person." See id. This factor thus supports the use of some level of force to overcome the resistance.

Considering the Graham factors as a whole and viewing the evidence in the light most favorable to Plaintiffs, the Court finds that the resistance offered by Rizzuti Sr. objectively justified an amount of force necessary to overcome that resistance and complete the officers' lawful objective of repositioning him and securing the scene. Although Plaintiffs dispute that Rizzuti Sr. offered any resistance at all, those allegations merely go to Rizzuti Sr.'s subjective intent, an aspect that has no place in the relevant inquiry. The Court therefore finds no genuine dispute of material fact and finds that summary judgment should be granted in Defendants' favor on Rizzuti Sr.'s excessive force claim with respect to post-handcuffing force.

### b.    Rizzuti Jr.'s Force Claims

Plaintiffs allege that the use of force against Rizzuti Jr. was unreasonable, alleging that he was hit with at least two closed fist strikes without warning or provocation for merely approaching the officers and asking, "What are you doing?" [Am. Compl. ¶¶ 119-22]. Defendants counter that the force used against Rizzuti Jr. was reasonable under the totality of circumstances, as there was a violent encounter in a space full of unknown persons and intentions where resistance had to quickly be stopped, and further, Rizzuti Jr. chased the officers into the Church, while screaming within arm's reach of the officers. [ECF No. 40 at 24-25]. It is undisputed that after Nunez struck Rizzuti Jr. and grabbed him, Rizzuti Jr. only complied and went to the ground after Nunez

threatened to spray him with OC spray. [Pls. Resp. SOMF ¶¶ 79-80]. Defendants argue that strikes, grappling, and threatening the use of OC spray were all constitutionally reasonable uses of force under the circumstances. [ECF No. 40 at 24-25].

With respect to Rizzuti Jr.'s excessive force claim, the segmented approach is also appropriate, as the encounter involved distinct uses of force in changing circumstances. See Lachance, 990 F.3d at 25.

### i.     Initial Strikes

According to Defendants, Rizzuti Jr. interfered with or attempted to interfere in the arrest of his father. [SOMF ¶ 77]. Rizzuti Jr. was within arm's reach of his father's arrest, yelling "What are you doing?" [Pls. Resp. SOMF ¶ 75]. Perceiving that Rizzuti Jr. was interfering or attempting to interfere with Rizzuti Sr.'s arrest, Nunez came toward Rizzuti Jr. and struck him in the left cheek. [Id. ¶ 78]. Nunez then attempted additional strikes, which Rizzuti Jr. dodged while backing away. From Rizzuti Jr.'s perspective, Nunez was "throwing haymakers" or wild, unorthodox punches at him, but kept missing after the initial strike. [Id. ¶ 64]. Given these statements of fact, the Court will now turn to applying the Graham factors to this phase of the interaction between Nunez and Rizzuti Jr.

First, as to the severity of the crime, this factor weighs in Defendants' favor. Although Rizzuti Jr. posits that he was merely asking "What are you doing?" to the officers arresting his father, he does not dispute that he positioned himself within arm's reach of the arrest. [Pls. Resp. SOMF ¶¶ 75, 77]. Additionally, Plaintiffs put forth—and fail to dispute—evidence indicating that Rizzuti Jr. was "hovering" near the officers and that he "took a fighting stance" after Nunez ordered him to stop. [SAMF ¶ 35]. While the Court recognizes that merely asking questions or verbally challenging police action is protected by the First Amendment and does not constitute a

crime, <u>City of Houston</u>, 482 U.S. at 461 ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."), obstructing or hindering the lawful arrest of another constitutes a serious crime.

Second, as to whether Rizzuti Jr. posed an immediate threat to officer safety, the factor leans in Defendants' favor. Under Rizzuti Jr.'s account, he was merely asking questions and posed no physical threat to the officers. [ECF No. 51 at 2, 15]. The uncontroverted facts, however, demonstrate that Rizzuti Jr. positioned himself within arm's reach of his father's arrest. [Pls. Resp. SOMF ¶¶ 75, 77]. Given that the officers were still attempting to secure Rizzuti Sr. at the time, Rizzuti Jr.'s actions, including "hovering" the officers and taking a combative stance after being ordered to stop, [SAMF ¶ 35], posed a serious threat to officer safety. <u>See</u> <u>Benavidez v. City of</u> <u>Rochester</u>, No. 3:21-CV-522 JD, 2023 WL 8766248, at *9 (N.D. Ind. Dec. 19, 2023) ("As a general proposition, a third party's interference with a lawful arrest can create a safety concern for the arresting officers which they have a right to use some force to contain." (citing <u>Clarett v.</u> <u>Roberts</u>, 657 F.3d 664, 672-73 (7th Cir. 2011)).

Third, as to whether Rizzuti Jr. was actively resisting arrest or attempting to evade arrest by flight, the record does not show that he was being placed under arrest at this stage of the interaction. This factor is therefore neutral.

Having carefully reviewed the facts, a majority of the <u>Graham</u> factors weigh in Defendants' favor. Viewing the evidence in the light most favorable to Plaintiffs, it would be objectively reasonable to strike an individual, who was not only asking questions about his father's arrest, but who was also in close proximity to the arrest, hovering, and taking a combative stance. Therefore, summary judgment must be granted as to Rizzuti Jr.'s excessive force claim related to the initial strikes.

ii.    Subsequent Force and Arrest

The events following the initial strikes are largely undisputed. Rizzuti Jr. continued to resist Nunez's attempts to control him, requiring the use of force to gain compliance. [Pls. Resp. SOMF ¶¶ 78-79]. When Nunez tried to take control of Rizzuti Jr.'s arms, Rizzuti Jr. pulled backwards. [Id. ¶ 79]. Nunez then displayed his O.C. spray to gain compliance, and when that appeared ineffective, attempted additional control techniques to secure Rizzuti Jr., which Nunez believed missed. [Id.]. While it is unclear where this fits in the course of events, the parties do not dispute that when Nunez produced his pepper spray, Rizzuti Jr. immediately asked him not to spray him, citing the presence of children in the Church, and voluntarily went to the ground. [Id. ¶ 80]. Nunez then handcuffed Rizzuti Jr. and proceeded to search his person in a search incident to arrest. [Id. ¶ 86].

First, regarding the severity of the crime, from an objective standpoint, Rizzuti Jr.'s act of backing away after the initial strike would reasonably be perceived by officers as resistance or evasion, regardless of his subjective intent. As explained supra, the Fourth Amendment inquiry relies only upon the reasonable perception of the facts clearly knowable to the officers at the time. See Lachance, 990 F.3d at 25 ("[E]xcessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." (quoting Mendez, 581 U.S. at 428). From an objective perspective, an individual backing away from an officer in the context of an ongoing arrest or, at the very least in the context of an attempt to secure an individual, constitutes resistance to lawful police demands. This type of resistance, while not violent, would objectively justify some degree of force to gain control of the individual. Thus, this factor weighs somewhat in favor of the officers' ability to use force to overcome this perceived resistance.

Second, as to whether Rizzuti Jr. posed an immediate threat to officer safety during this phase of the counter, this factor weighs in Defendants' favor. A reasonable officer in a volatile arrest situation might perceive someone backing away after being told to stop as potentially threatening, particularly given the unpredictable nature and fast-changing pace of the situation. That threat was heightened by the fact that Nunez had already perceived Rizzuti Jr. to be interfering or attempting to interfere in Rizzuti Sr.'s arrest by "hovering" near the officers and taking a fighting stance after being ordered to stop. [Pls. Resp. SOMF ¶ 77; SAMF ¶ 35].

Third, as to whether Rizzuti Jr. was actively resisting arrest or attempting to evade arrest by flight, this factor leans slightly in Defendants' favor. It remains uncontested that Rizzuti Jr. was struggling and refusing to be handcuffed. Backing away could objectively be perceived a resistance or evasion by a reasonable officer, regardless of subjective intent. In such circumstances, it was objectively reasonable for Nunez to use some force to secure Rizzuti Jr. See Graham, 490 U.S. at 396. However, both parties agree that when Nunez produced the pepper spray, Rizzuti Jr. voluntarily went to the ground. [Pls. Resp. SOMF ¶ 80; SAMF ¶ 65]. This objectively indicates a cessation of any resistance at that point. Once a subject is on the ground and no longer resisting, the justification for continued force diminishes significantly. See Smith, 2020 WL 1514610, at *9 ("[I]t is unreasonable to use significant physical force upon a non-resisting, compliant person[.]" (emphasis added)) (collecting cases). In this instance, there is no indication that Nunez exerted further force after Rizzuti Jr. stopped resisting and went to the ground. [Pls. Resp. SOMF ¶ 80; SAMF ¶ 65].

Having reviewed the Graham factors and viewing the facts in the light most favorable to Plaintiffs, the Court finds that the force used against Rizzuti Jr. was objectively reasonable under

the circumstances. Therefore, summary judgment must be granted as to Rizzuti Jr.'s excessive force claim related to the use of force exercised after the initial strike.

c.    Karissa's Force Claims

Defendants argue that the force used against Karissa was reasonable because she was interfering with Nunez's search of her husband incident to his arrest. They contend that when Karissa bent down to pick up items that Nunez had removed from Rizzuti Jr.'s pockets, she was interfering with the search process, justifying the use of force to stop her interference. [SOMF ¶¶ 86, 92; ECF No. 40 at 25]. Plaintiffs maintain that the force used was excessive and unprovoked. [ECF No. 51 at 2]. According to Karissa, she merely bent down to retrieve her husband's pocket Bible and wallet that Nunez had "cavalierly tossed onto the ground." [SAMF ¶ 80]. She testified that, without warning, she felt a strike to her face with enough force to knock her down, after which she was flipped onto her stomach and handcuffed despite being pregnant and informing the officers of this fact.[20] [SOMF ¶ 93; SAMF ¶¶ 81-82]. Because the encounter between Nunez and Karissa appears to involve a single use of force—the strike to her face followed immediately by handcuffing—the Court declines to adopt the segmented approach here. See Lachance, 990 F.3d at 25. The Court will now turn to applying the Graham factors.

First, with respect to the severity of the crime, there is no genuine dispute of material fact. The parties agree that Karissa picked up items that Nunez had removed from her husband's pockets during a search incident to arrest. [Pls. Resp. SOMF ¶ 92; SAMF ¶ 80]. While the parties characterize this action differently—Defendants viewing it as interference with a search, Plaintiffs viewing it as retrieving personal belongings—the underlying factual act is not disputed. From an objective standpoint, Karissa's actions could reasonably be perceived as interfering with police

---

[20] The record is devoid of any indication that Defendants were aware of Karissa Rizzuti's pregnancy before engaging with her.

50

duties and risking the destruction or tampering of evidence. See Deptula v. City of Worcester, 613 F. Supp. 3d 507, 517-19 (D. Mass. 2020) (recognizing that officers may use reasonable force to prevent the destruction of evidence). Interference with a search incident to arrest is a relatively minor offense, particularly when the interference consists merely of picking up items from the ground rather than physically obstructing the officer. The minor nature of this offense would thus justify minimal force.

Second, concerning whether Karissa posed an immediate threat to officer safety, there is again no genuine dispute of material fact. The objective evidence does not suggest any significant threat. According to the parties' accounts, she was simply bending down to pick up items from the ground. [Pls. Resp. SOMF ¶ 92; SAMF ¶¶ 80-81]. There is no evidence that Karissa made any threatening movements or gestures toward Nunez or that she was armed or otherwise capable of inflicting harm. Nunez himself acknowledged that Karissa did not try to stop him from arresting her husband nor did she physically touch him. [SAMF ¶ 36; SAMF, Ex. 4 (Nunez Dep.) at 60:24, 61:1-5]. From an objective standpoint, a woman picking up items from the ground poses minimal, if any, threat to officer safety. The context of the encounter is also relevant to the objective reasonableness analysis. By the time of Karrisa's arrest, both Rizzuti Sr. and Rizzuti Jr. had already been handcuffed and were under control. [SOMF ¶¶ 82, 86]. This reduces any objective justification for using significant force based on the volatility of the situation. Thus, this factor weighs against finding the force used reasonable.

Third, as to whether Karissa was actively resisting arrest or attempting to evade arrest by flight, there is no genuine dispute of material fact. As already discussed, Nunez himself acknowledged that Karissa did not physically resist her arrest. [SAMF ¶ 37]. And, according to Karissa's testimony, she was not even aware she was going to be arrested when Nunez struck her.

[SOMF ¶ 93]. The objective evidence indicates no resistance prior to force being used. This factor weighs strongly against finding the force used reasonable.

The <u>Graham</u> factors weigh mostly against the use of force. Because Defendants raise qualified immunity, this is not the end of the matter. The Court will take the issue in due course <u>infra</u>.

### 3.    *Conspiracy Claims*

At Counts VII through IX, the Plaintiffs present a series of federal and state conspiracy claims. Under Section 1983, a civil rights conspiracy involves "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." <u>Sánchez v. Foley</u>, 972 F.3d 1, 11 (1st Cir. 2020) (quoting <u>Est. of Bennett v. Wainwright</u>, 548 F.3d 155, 178 (1st Cir. 2008)). In addition to a conspiratorial agreement, the plaintiff must show "an actual abridgment of some federally-secured right." <u>Id.</u> (quoting <u>Nieves</u>, 241 F.3d at 53). This requirement reflects the fact that a "[c]onspiracy is merely the mechanism by which to obtain the necessary state action, or to impose liability on one defendant[.]" <u>Id.</u> (quoting <u>Landrigan v. City of Warwick</u>, 628 F.2d 736, 742 (1st Cir. 1980)). While conspiracies may be established through circumstantial evidence and are often a matter of inference, <u>id.</u> at 12 ("[A] plaintiff need not present direct evidence of the agreement."), summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations without necessary supporting factual assertions, <u>Est. of Bennett</u>, 548 F.3d at 178.

Here, even assuming arguendo that genuine disputes of material fact remain as to whether Plaintiffs' constitutional rights were violated, the conspiracy claims fail because there is no

evidence in the record—direct or circumstantial—from which a reasonable trier of fact could infer an agreement between Cappabianca and Nunez to violate Plaintiffs' constitutional rights. The record shows that Nunez was sent to the Church to conduct a well-being check on Rachel's daughter, while Cappabianca, assigned that evening to work the area of 78 Waverly Street, was dispatched to assist. [SOMF ¶ 22]. Cappabianca arrived on scene after Nunez had already begun speaking with the family members. [SOMF ¶ 36]. The officers' actions throughout the incident appear to be individual responses to rapidly evolving circumstances rather than coordinated conduct pursuant to any pre-conceived agreement. The Body Camera Footage shows that Nunez moved very quickly away from Rizzuti Sr. and toward the front of the Church to deal with Rizzuti Jr., who was in close proximity to the officers and whom Nunez perceived to be interfering with the arrest of Rizzuti Sr. [SOMF ¶¶ 76-77; Body Camera Footage at 1:14]. This separation of the officers' activities further undermines any inference of conspiratorial agreement. The record is devoid of any evidence suggesting the officers communicated about a plan to violate Plaintiffs' rights, acted with any shared unlawful purpose, or engaged in conduct that differed from what each could have accomplished individually in response to the situation they confronted.

As for the state claims, Massachusetts law recognizes two types of civil conspiracy: the first is true conspiracy, "based on coconspirators exerting some peculiar power of coercion," and the second is concerted action conspiracy, a "form of vicarious liability for the tortious conduct of others . . . requir[ing] an underlying tort." Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 682 (Mass. 2023) (citation modified); Taylor v. Am. Chemistry Council, 576 F.3d 16, 34-35 (1st Cir. 2009).

The second theory, concerted action conspiracy, "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to

encourage the achievement of the result." <u>Greene</u>, 208 N.E.3d at 683 (quoting <u>Kurker v. Hill</u>, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998)). As with the federal conspiracy claims, the record contains no evidence of any agreement, common plan, or coordinated action between the officers.

This leaves only the true conspiracy theory under Massachusetts law. To advance a true conspiracy claim, Plaintiff must allege and prove "that by 'mere force of numbers acting in unison' the defendants exercised 'some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had.'" <u>Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.</u>, 62 F. Supp. 2d 236, 244 (D. Mass. 1999) (quoting <u>Fleming v. Dane</u>, 22 N.E.2d 609, 611 (Mass. 1939)). In other words, Cappabianca and Nunez must have been able to collectively "bring about results that are different in kind from what any of them could achieve individually." <u>Koufos v. U.S. Bank, N.A.</u>, 939 F. Supp. 2d 40, 51 (D. Mass. 2013) (quoting <u>Mass. Laborers'</u>, 62 F. Supp. 2d at 244). Here, there is no evidence that Cappabianca and Nunez possessed any collective power of coercion beyond what each possessed individually as police officers responding to the scene.

Because the record contains no evidence—direct or circumstantial—from which a reasonable trier of fact could infer an agreement between Cappabianca and Nunez to violate Plaintiffs' constitutional rights, the conspiracy claims in Counts VII through IX fail as a matter of law and summary judgment must be granted in Defendants' favor.

### 4. *Malicious Prosecution Claims*

Count X advances both federal and state claims of malicious prosecution by Rizzuti Sr., Rizzuti Jr., and Karissa against Officers Cappabianca and Nunez.

Starting with the federal claims, although there is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecution, "the Fourth Amendment . . .

provides potentially more fertile soil" for a Section 1983 claim for malicious prosecution. <u>Nieves</u>, 241 F.3d at 54. Plaintiffs may bring a malicious prosecution suit under Section 1983 if they can establish that the defendants "(1) caused (2) a seizure of the plaintiff[s] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff[s'] favor." <u>Hernandez-Cuevas v. Taylor</u>, 723 F.3d 91, 101 (1st Cir. 2013) (citation modified). Police officers may be liable for a wrongfully indicted defendant's "unlawful pretrial detention when they have (1) lied to or misled the prosecutors; (2) failed to disclose exculpatory evidence; or (3) unduly pressured the prosecutor to seek the indictment." <u>Id.</u> at 100 (same).

However, "[w]here, as here, a person is arrested without a warrant and before the issuance of any legal process, that arrest does not form part of a Fourth Amendment seizure upon which a [S]ection 1983 claim may be premised." <u>Harrington v. City of Nashua</u>, 610 F.3d 24, 32 (1st Cir. 2010) (citing <u>Nieves</u>, 241 F.3d at 54). Plaintiffs "cannot base a malicious prosecution claim on [their] warrantless arrest, because it did not constitute legal process." <u>Meehan v. Town of Plymouth</u>, 167 F.3d 85, 90 (1st Cir. 1999); <u>accord</u> <u>Watson v. Mita</u>, 396 F. Supp. 3d 220, 224 (D. Mass. 2019). Indeed, the record establishes that Plaintiffs were arrested without warrants on August 25, 2019. [SOMF ¶¶ 63-64, 80, 92-94]. Moreover, Plaintiffs have failed to identify any post-arraignment deprivation of liberty that would constitute a seizure pursuant to legal process. <u>See</u> <u>Nieves</u>, 241 F.3d at 54-55. This leaves the Court with no option but to grant summary judgment in Defendants' favor for the federal malicious prosecution claim.

Turning to the state claims, the elements of a common-law cause of action for malicious prosecution are: "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice."

Cabot, 241 F. Supp. 3d at 260 (quoting Nieves, 241 F.3d at 53). Plaintiffs must show that Defendants "commenced or continued the criminal proceedings against [them]" and that they acted with "improper purpose." Watson, 396 F. Supp. 3d at 225 (quoting Wilber v. Curtis, 872 F.3d 15, 24 (1st Cir. 2017)) (citing Nieves, 241 F.3d at 51). In the instant case, probable cause existed for Rizzuti Jr.'s and Karissa's arrest. That is fatal to their malicious prosecution claim under state law, and summary judgment in Defendants' favor is appropriate. Nevertheless, as discussed in further detail supra, because disputed factual questions preclude a determination that probable cause existed as to Rizzuti Sr.'s arrest, Defendants' motion for summary judgment on Rizzuti Sr.'s common-law malicious prosecution claim is denied.

### 5.    *Monell Claims Against the City of Worcester*

In Count XII, Plaintiffs bring Monell claims under Section 1983 against the City of Worcester, alleging that the "WPD Defendants' violations of the Rizzuti's constitutional rights were caused by the policies and customs of the City of Worcester[.]" [Am. Compl. ¶¶ 316-18; ECF No. 51 at 29-33]. Plaintiffs' principal allegations against the City of Worcester involve failure to train and failure to investigate police officer misconduct and use of force. [Am. Compl. ¶ 188].

Local governments are not vicariously liable under Section 1983 for their employees' actions. Monell, 436 U.S. at 691. However, they may be liable for constitutional violations under Section 1983 if the government body "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by that body's officers, or if there are "persistent and widespread discriminatory practices of state officials" which are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Id. at 690-91. Under color of an official policy or custom of these types, a local government may be liable for subjecting

a person to a deprivation of constitutional rights or for causing a person to be subjected to such a deprivation. Id. at 691-92; Fletcher v. Town of Clinton, 196 F.3d 41 41, 55 (1st Cir. 1999).

Specifically, Plaintiffs allege a "policy, custom, and usage of failing to exercise discipline and control over the use of force by police officers, demonstrating deliberate indifference to the rights and safety of citizens." [Am. Compl. ¶ 188]. Plaintiffs, however, do not proffer any evidence of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by WPD, and thus can only succeed under the "'custom or usage' with the force of law" theory. Monell at 690-91.

Failure to act may constitute a custom sufficient for the purposes of Section 1983 liability if the inaction reflects a government's "deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 563 U.S. 51, 61-62 (2011) (citation modified) (quoting Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997)).

As an initial matter, and as explained supra, the only predicate constitutional injury is found in Rizzuti Sr.'s false arrest claim and Karissa's excessive force claim. Nevertheless, Plaintiffs' Monell claim cannot survive summary judgment because they fail to demonstrate how the alleged failure to act of the City of Worcester *caused* Plaintiffs' constitutional harm. See Justiniano v. Walker, 986 F.3d 11, 20 (1st Cir. 2021). Even if a plaintiff can show deliberate indifference, they must still show a causal nexus between the municipal conduct and the constitutional injury. McElroy v. City of Lowell, 741 F. Supp. 2d 349, 355-56 (D. Mass. 2010). For deliberate indifference causation, the plaintiff must show that the municipality had: "(1) knowledge of an

obvious risk to the constitutional rights of persons police would come in contact with; and (2) that there was a conscious failure to act despite the obvious risk." Id. at 356.

For the first prong, Plaintiffs fail to allege that the City of Worcester had the requisite knowledge of an obvious risk to the constitutional rights of its citizens. See id. It is undisputed that Cappabianca had never been the subject of a complaint of wrongdoing outside of matters related to this case, and it is also undisputed that neither Cappabianca nor Nunez had any disciplinary record in the Worcester Police Department, nor in their previous or subsequent departments. [Pls. Resp. SOMF ¶¶ 6, 10]. It is also undisputed that they were subject to an internal investigation. [ECF No. 51 at 3]. Yet, Plaintiffs allege that the procedures in place were insufficient, that they demonstrated "indifference in training" and "unwillingness to investigate" and that this was in fact, the "moving force" of Defendant Officers' alleged constitutional violations on August 25, 2019. [Id. at 31-32].

In support of this contention, Plaintiffs rely heavily on an investigative report (the "DOJ report") issued by the U.S. Department of Justice Civil Rights Division and the U.S. Attorney's Office for the District of Massachusetts on December 9, 2024. [See ECF No. 49-16]. The DOJ report was the culmination of a two-year civil investigation into the practices of the City of Worcester and the Worcester Police Department. Although the DOJ report broadly references the incident at issue, it primarily addresses a broader pattern or practice of unconstitutional conduct by the City of Worcester and the Worcester Police Department, including allegations of excessive force, racial discrimination, and sexual assault. [Id. at 3]. Such evidence would not be admissible at trial because its highly prejudicial nature substantially outweighs any probative value it might offer, and it risks unfairly influencing the jury, confusing the issues, and shifting focus away from the conduct of the officers in this case. See Fed. R. Evid. 403; Jones v. Chapman, No. ELH-14-

2627, 2017 WL 1546432, at *4 (D. Md. Apr. 28, 2017) ("The jury may be unduly influenced by the DOJ Report, and defer to the conclusions and findings contained in that report that are critical of the [police department], in lieu of considering the actual facts of this case, as presented at trial, and legal arguments pertinent to this case."). It is well-established that courts may only consider evidence at summary judgment that would be admissible at trial or could be presented in admissible form. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (on summary judgment "a court may take into account any material that would be admissible or usable at trial," but "inadmissible evidence may not be considered."). Because the DOJ report would not be admissible in its current form—or in any form likely to be permitted at trial—it cannot be considered for purposes of resolving the pending motion.[21] [See ECF No. 53 at 36:11-13, 36:15-37:9 (ruling against admission of DOJ report)].

Plaintiffs do not otherwise point to any evidence indicating that the City had knowledge of an obvious risk. In the Amended Complaint, Plaintiffs allege that Cappabianca and Nunez felt it was "appropriate or acceptable for them to escalate police encounters" at the time of the incident solely because the 2019 use of force policy (#400) mentioned "escalate" and "de-escalate" in passing, and because this policy was updated to more comprehensively discuss de-escalation techniques after the incident 2022. [Am. Compl. at ¶¶ 69-74]. Similarly, the Amended Complaint alleges that WPD's internal investigations were inadequate because their process at the time permitted officers to submit written statements instead of requiring in-person interviews, and they

---

[21] Defendants have also alleged that the DOJ lacks trustworthiness because it was "ushered in on the eve of a change in administrations so that the report would come out a certain way," as well as because the officers in this case were not interviewed as part of the DOJ's civil investigation. [ECF No. 53 at 30:9-24, 33:1]. In determining the trustworthiness of a public record pursuant to Fed. R. Evid. 803(8)(B), the Court must consider the following factors: (1) the timeliness of the investigation; (2) the special skill and experience of the investigator; (3) whether a hearing was held and at what level the hearing was conducted; and (4) improper motivation underlying the investigation. Fed R. Evid. 803 advisory committee's note to paragraph (8)(c). In the Court's view, Defendants have made a valid point as to whether the DOJ report lacks a proper indicium of reliability to be used at trial and, therefore, in support of summary judgment.

claim this "led police officers including Officer Cappabianca, Nunez and others to believe they were above the law, that they could violate the rights of citizens because they knew they would not be disciplined." [Id. ¶ 182]. In any event, Plaintiffs' allegations in the Amended Complaint are improper for consideration at the summary judgment stage, as it is unverified. See Doherty v. Donahoe, 985 F. Supp. 2d 190, 195 (D. Mass. 2013) (citing Sheinkopf, 927 F.2d at 1262-63); Cardoso v. City of Brockton, No. CIV.A. 12-10892-DJC, 2014 WL 6698618, at *5 (D. Mass. Aug. 11, 2014). However, even if the Amended Complaint was properly verified and part of the summary judgment record, it is still insufficient to establish that there was knowledge of an obvious risk. At best, these conclusory allegations suggest the policies or investigations were ineffective or perhaps even negligent, but that is not enough for municipal liability to attach under Section 1983. See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). Plaintiffs thus fail to show that the Defendants had "knowledge of an obvious risk to the constitutional rights of persons police would come in contact with." McElroy, 741 F. Supp. 2d at 356 (emphasis added).

Without satisfying the first prong of deliberate indifference, Plaintiffs fail to allege that "persistent and widespread discriminatory practices of state officials" which are "so permanent and well settled as to constitute a 'custom or usage' with the force of law" caused Officers Cappabianca and Nunez to violate Plaintiffs' constitutional rights. Monell, 436 U.S. at 691. Therefore, summary judgment will be granted in Defendants' favor on Plaintiffs' Monell liability claim.

### 6.    *Qualified Immunity for Section 1983 Claims*

Defendants maintain they are qualifiedly immune from liability. The qualified immunity doctrine protects public officials, in their individual capacity, "when a reasonable decision in the

line of duty ends up being a bad guess—in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 22-24 (1st Cir. 2016) (quoting Taylor v. Barkes, 575 U.S. 822, 825 (2015)). To establish whether government officials are entitled to qualified immunity, the Court must engage in a "two-pronged inquiry." Tolan v. Cotton, 572 U.S. 650, 655-56 (2014). The Court must determine: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) whether the right in question was "clearly established" at the time of defendant's alleged misconduct. See id. "The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed." Lachance, 990 F.3d at 21 (quoting Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015)). Determining whether a right is "clearly established" also requires a two-part inquiry. See Justiniano, 986 F.3d at 26. First, the law defining the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the alleged constitutional violation. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). And second, in the factual context of the case, a reasonable defendant would have to understand that his conduct violated the plaintiff's constitutional rights. Fontanes, 568 F.3d at 269. To demonstrate that the law was clearly established, a plaintiff may rely on "controlling authority" or a "robust consensus of cases of persuasive authority," the latter which may be satisfied by sister circuit case law, as a "robust consensus" does not necessarily "require the express agreement of every circuit." Irish v. Fowler, 979 F.3d 65, 76-77 (1st Cir. 2020) (citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018); Wilson v. Layne, 526 U.S. 603, 616-18 (1999)). Although a case "need not arise on identical facts, it must be sufficiently analogous

to make pellucid to an objectively reasonable officer the unlawfulness of his actions." <u>Gray</u>, 917 F.3d at 10.

The Court recognizes the challenges posed by deciding qualified immunity at the summary judgment stage. Indeed, because qualified immunity is an immunity from suit, it is "effectively lost" if permitted to proceed to trial. <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). As such, the application of the immunity should be resolved at the earliest stage of litigation, which typically occurs on a motion for summary judgment. <u>Fontanes</u>, 568 F.3d at 268; <u>Justiniano</u>, 986 F.3d at 27. The intersection of qualified immunity principles and summary judgment principles presents "thorny analytic[al] problems," including "a tug-of-war . . . between who gets the benefit of the doubt: summary judgment requires absolute deference to the nonmovant's factual assertions, while qualified immunity demands deference to the reasonable, if mistaken, actions of the movant." <u>Justiniano</u>, 986 F.3d at 27 (citation modified). Therefore, the court must "identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." <u>Penate</u>, 73 F.4th at 17 (quoting <u>Morelli</u>, 552 F.3d at 19).

a.    False Arrest Claims

In their motion for summary judgment, Cappabianca and Nunez argue that they are entitled to qualified immunity as to Plaintiffs' false arrest claims. For the reasons detailed <u>supra</u>, the Court has determined that there is no genuine dispute as to whether Cappabianca or Nunez had probable cause for Rizzuti Jr.'s and Karissa's arrests. Therefore, the Court need not reach their qualified immunity contention. <u>Karamanoglu v. Town of Yarmouth</u>, 15 F.4th 82, 91 (1st Cir. 2021).

As it relates to Rizzuti Sr., for the reasons detailed <u>supra</u>, the record establishes that the first prong has been satisfied. The facts, viewed in the light most favorable to Plaintiffs, could

support a finding that Cappabianca violated Rizzuti Sr.'s Fourth Amendment rights by arresting him without probable cause. Defendants do not deny that the constitutional rights at issue—the right to be free from arrest without probable cause—were well established by the time of the incident. [ECF No. 40 at 17-20]. Indeed, "[i]t is hornbook law that the Fourth Amendment requires probable cause to place an individual under arrest." Alfano v. Lynch, 847 F.3d 71, 76 (1st Cir. 2017). Therefore, the only factor in dispute is whether a similarly situated reasonable officer would have known his conduct violated Plaintiffs' constitutional rights. For false arrest claims, however, the qualified immunity standard is more forgiving than the standard for probable cause. Aaron v. City of Lowell, 666 F. Supp. 3d 102, 123 (D. Mass. 2023) (holding that "[q]ualified immunity 'requires a somewhat lesser showing'" compared to probable cause (quoting Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004)); see Nuon v. City of Lowell, 768 F. Supp. 2d 323, 334 (D. Mass. 2011) ("In the context of a false arrest claim, only a clear absence of probable cause will defeat a claim of qualified immunity."). In the case of a warrantless arrest, officers are entitled to qualified immunity "if the presence of probable cause is arguable or subject to legitimate question." Aaron, 666 F. Supp. 3d at 123 (quoting Cox, 391 F.3d at 31); accord Glik v. Cunniffe, 655 F.3d 78, 88 (1st Cir. 2011). It follows that these claims may go forward only if the unlawfulness of the arrests would have been apparent to an objectively reasonable officer standing in Cappabianca's and Nunez's shoes. See McDonald v. City of Boston, 334 F. Supp. 3d 429, 439 (D. Mass. 2018) (citation omitted) ("[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.").

In this instance, Cappabianca is entitled to qualified immunity because the presence of probable cause was at least arguable. Cappabianca could reasonably have believed he had probable cause to arrest Rizzuti Sr. based on his flight and conduct during the pursuit. When Cappabianca

began approaching him, Rizzuti Sr. fled into the Church. During his flight, Rizzuti Sr. swung the door closed behind him, striking Cappabianca. This sequence of events provided arguable probable cause for multiple offenses, including at the very least evading arrest and assault and battery on a police officer. An objectively reasonable officer could view a suspect's flight from arrest as evidence of guilt and resistance, justifying the use of force to apprehend him. [See SOMF ¶¶ 63-69]; see United States v. Concepcion-Guliam, 62 F.4th 26, 34 (1st Cir. 2023) ("Evidence of flight may form a basis for an inference of consciousness of guilt."). Moreover, Cappabianca could not have known whether Rizzuti Sr. was fleeing into the Church to arm himself or leading them into a more dangerous confined location. "The availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable." Cox, 391 F.3d at 32. An objectively reasonable officer observing Rizzuti Sr.'s flight into an unknown building and the door striking incident could have believed probable cause existed for his arrest.[22] Qualified immunity is therefore appropriate regarding Rizzuti Sr.'s false arrest claims, including his retaliatory arrest claim.

b.    Excessive Force Claims

Cappabianca and Nunez additionally maintain that they are entitled to qualified immunity on Plaintiffs' excessive force claims. As explained in further detail supra, Plaintiffs have failed to show any constitutional violation as it relates to Rizzuti Sr. and Rizzuti Jr. As such, the Court need not reach the officers' qualified immunity arguments. See Stone v. Evangelidis, 507 F. Supp. 3d 366, 375-76 (D. Mass. 2010). The Court notes, however, that even if Plaintiffs had made out a constitutional violation, qualified immunity would still attach. As to Rizzuti Sr., Plaintiffs

---

[22] Probable cause need only exist as to at least one crime that might be charged at the time of the arrest. See, e.g., Robinson v. Cook, 863 F. Supp. 2d 49, 65 (D. Mass. 2012); Morrisey v. Town of Agawam, 883 F. Supp. 2d 300, 311 (D. Mass. 2012).

identified six out-of-circuit cases purportedly constituting controlling authority or a consensus of

persuasive authority sufficient to put officers on notice that their conduct violated the law. [ECF

No. 51 at 17-20]. While we are permitted to look to the case law of sister circuits in determining

whether a right was clearly established, McCue v. City of Bangor, 838 F.3d 55, 64 (1st Cir. 2016),

in the Court's view, the precedents put forth by Plaintiffs are easily distinguishable to the facts at

hand and, in some instances, even undermine Plaintiffs' challenge.[23] And in any event, based on

---

[23] Brown v. Weber, 555 F. App'x 550 (6th Cir. 2014): Unlike Brown, who only took a combative stance and otherwise made no aggressive moves toward officers, Rizzuti Sr. had already performed a number of actions before the Taser was deployed—he yelled at Cappabianca; fled when Cappabianca began approaching him; swung the door close behind him, striking Cappabianca; and actively resisted handcuffing once brought to the ground. [SOMF ¶¶ 50, 61-65, 69, 73, 81-82]. Most significantly, Brown recognized that, like here, officers do not violate the Fourth Amendment when using a Taser on suspects who actively resist arrest and refuse to be handcuffed. 555 F. App'x at 554-55.

Correa v. Simone, 528 F. App'x 531 (6th Cir. 2013): Unlike the plaintiff in Correa who was complying with commands by kneeling with his hands up, Rizzuti Sr. was actively refusing to comply with handcuffing orders and physically resisting by keeping his arms interlocked underneath his body. [SOMF ¶¶ 73, 81]. Additionally, Correa specifically noted that resistance requires "something more, such as a physical or verbal action." 528 F. App'x at 536. Here, Rizzuti Sr. provided both through his physical resistance to handcuffing and his continued verbal defiance even after being brought to the ground. [SOMF ¶¶ 73, 81, 83].

Hagans v. Franklin Cnty. Sheriff's Off., 695 F.3d 505 (6th Cir. 2012): Hagans actually supports the Defendants' position rather than undermines it. Indeed, the court recognized that, at least as of 2007, the law had not clearly established that tasing someone who physically resisted handcuffing violated the Fourth Amendment. Id. at 509. More importantly, like the suspect in Hagans, who was "lock[ing] his arms tightly under his body," id., Rizzuti Sr. was similarly resisting by keeping his arms interlocked underneath his body and refusing commands to place his hands behind his back, [SOMF ¶¶ 73, 81].

Thomas v. Plummer, 489 F. App'x 116 (6th Cir. 2012): While Thomas had completely surrendered by kneeling with her hands above her head in a submissive position, Rizzuti Sr. was doing the exact opposite—he was prone on the ground but resisting by keeping his arms interlocked underneath his body and refusing repeated commands to place his hands behind his back for handcuffing. [SOMF ¶¶ 73, 81]. The Thomas court specifically emphasized that the plaintiff "posed absolutely no threat" and "offered no active resistance." 489 F. App'x at 126. Neither characterization can apply to Rizzuti Sr.'s conduct.

Gravelet-Blondin v. Shelton, 728 F.3d 1086 (9th Cir. 2013): The factual circumstances in Gravelet-Blondin bear no resemblance to this case. In addition to the finding that the plaintiff posed no threat to the safety of the officers or the public, the Ninth Circuit specifically found that the plaintiff "committed no act of resistance." 728 F.3d at 1094. Here, Rizzuti Sr. had engaged in multiple threatening and potentially criminal acts. [SOMF ¶¶ 50, 61-65, 69, 73, 81-82]. Moreover, while Gravelet-Blondin was an innocent bystander who was merely observing a police response involving his neighbor, Rizzuti Sr. was the subject of an arrest who was in direct physical contact with officers attempting to handcuff him. See Gravelet-Blondin, 728 F.3d at 1089-90. The Taser deployment in Gravelet-Blondin occurred before the officer even finished issuing his warning to a compliant, fearful bystander, whereas here the Taser was used only after Rizzuti Sr. had repeatedly ignored verbal commands and continued to actively resist the handcuffing process following a questionable series of actions. See id.

the undisputed facts, the Court finds that an objectively reasonable officer in Cappabianca's position would not have known that his conduct violated the law. See, e.g., Gray, 917 F.3d at 12-13 (holding that, as of May 2013, an objectively reasonable officer could conclude that using a Taser in drive stun mode against a nonviolent, mentally ill individual resisting arrest did not violate the Fourth Amendment); Ehlers v. City of Rapid City, 846 F.3d 1002, 1011 (8th Cir. 2017) (holding that officer was entitled to qualified immunity because an officer could have reasonably interpreted plaintiff's behavior of "continuing to lay on his hands and refusing to comply with instructions as resistance"); Silverman v. Lane, No. 18-04510 BLF (PR), 2020 WL 3544987, at *1 (N.D. Cal. June 30, 2020) ("[T]here is no Supreme Court precedent prior to — or after — July 1, 2018, discussing whether tasing an inmate . . . on 'drive stun' mode for three seconds to gain compliance after numerous orders are ignored constitutes excessive force"); Singer v. Thompson, No. 3:21-CV-478, 2022 WL 8287197, at *9 (M.D. Pa. May 4, 2022), report and recommendation adopted, WL 4536404 (M.D. Pa. Sept. 28, 2022) (holding that, as of September 2019, "far from being clearly established as a Fourth Amendment infraction in this factual context . . . circuit case law has repeatedly conferred qualified immunity on police officers . . . who engaged in an isolated use of a Taser to subdue a fleeing suspect who was resisting arrest and refusing to comply with lawful commands"); Harris v. Leon, No. 20 CIV. 10864 (LGS), 2023 WL 2051171, at *6 (S.D.N.Y. Feb. 16, 2023) ("Defendants are entitled to summary judgment under the doctrine of qualified immunity because, in September 2020 when the arrest occurred, neither the Supreme

---

Thompson v. City of Monticello, 894 F.3d 993 (8th Cir. 2018): The court explicitly noted that it was not addressing whether the plaintiff had acted "aggressive, confrontational, and resistant" because it lacked jurisdiction to resolve disputed facts. Id. at 999. Here, however, there is no dispute that Rizzuti Sr. acted confrontationally and with continuous resistance. [Pls. Resp. SOMF ¶¶ 50, 69, 73, 81-84]. Moreover, while Thompson involved a "nonviolent misdemeanor" stop where the suspect's "hands were visible" and he was "not resisting," 894 F.3d at 999, this case involves someone who was perceived as violent (assault and battery on a police officer with a dangerous weapon), and at the very least was actively resisting handcuffing and keeping his hands hidden beneath his body in defiance of commands. [SOMF ¶¶ 69, 73, 81-82, 104].

Court nor the Second Circuit had clearly established that a police officer may not use a [T]aser on a person who is resisting arrest, but is not violent or threatening."). Accordingly, Cappabianca would be entitled to qualified immunity.

On the other hand, as detailed supra, Plaintiffs have made out a constitutional violation as to Karissa's excessive force claim. Nevertheless, Plaintiffs have failed entirely to meet their burden of demonstrating that the law was clearly established as to the force used against Karissa. Plaintiffs cite no case law whatsoever indicating that the officers' conducts toward her was objectively unreasonable under the circumstances they faced. [See generally ECF No. 51]. This alone is fatal to their challenge to Defendants' qualified immunity claims. See Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 410-13 (1st Cir. 2022) ("We hold that the officers are entitled to qualified immunity under each aspect of the "clearly established" prong of the defense . . . . because the Estate has not identified any authority that would put the officers on notice that their actions were unlawful."); Aaron v. City of Lowell, No. 20-CV-11604-ADB, 2024 WL 3677637, at *7 (D. Mass. Aug. 5, 2024) (holding that officer was entitled to qualified immunity because plaintiff failed "to direct the Court to any case law"). Without any supporting precedent, Plaintiffs cannot establish that it was clearly established in August 2019 that officers violated the Fourth Amendment by striking an individual who interfered with an ongoing search incident to arrest. It is for the same reason that, even if Plaintiffs had made out a constitutional violation as to Rizzuti Jr., qualified immunity would still attach. Accordingly, Nunez is entitled to qualified immunity as it relates to Karissa's excessive force claims.

### D.    State Law Intentional Tort Claims

Plaintiffs bring state law claims of false arrest, assault and battery, malicious prosecution, civil conspiracy, and intentional infliction of emotional distress ("IIED") against the defendant

officers. Although section 10(c) of the Massachusetts Tort Claims Act ("MTCA") bars municipal liability for "any claim arising out of an intentional tort," Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996) (quoting Mass. Gen. Laws ch. 258, § 10(c)), section 10 "provides for exemptions from operation of [MTCA] § 2 . . . [and] states in pertinent part that a public employee shall not be immune from 'any claim arising out of an intentional tort.'" McNamara v. Honeyman, 546 N.E.2d 139, 142 (Mass. 1989); see also Spring v. Geriatric Auth. of Holyoke, 475 N.E.2d 727, 734 n.9 (Mass. 1985) ("While public employers . . . may not be held liable for intentional torts committed by their employees, the employees may be personally liable for any harm they have caused."). Accordingly, in situations as the present where police officers are sued in their individual capacities, they are not immune from suit for such intentional torts. Carter-Galica v. Town of Warren, No. 09-P-882, 2010 WL 2160313, at *1 (Mass. App. Ct. June 1, 2010). Because Plaintiffs' state law claims of false arrest, assault and battery, malicious prosecution, civil conspiracy overlapped with their federal counterparts supra, the Court need only address Plaintiffs' IIED claims.

Plaintiffs claim to suffer severe emotional distress as a result of this incident, including Persistent Depressive Disorder (Dysthymia), Generalized Anxiety Disorder, and Posttraumatic Stress Disorder. [ECF No. 51 at 23-26]. Under Massachusetts law, a claim of IIED requires the plaintiff to allege: (1) "that the actor intended to inflict emotional distress or that [they] knew or should have known that emotional distress was the likely result of [their] conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of

a nature that no reasonable [person] could be expected to endure it. Agis v. Howard Johnson Co., 355 N.E.2d 315, 318-19 (1976) (citation modified).

Massachusetts case law requires a high standard for sufficiently severe emotional harm. Compare Bailey v. Shriberg, 576 N.E.2d 1377, 1379 (1991) (finding no sufficiently "severe" emotional distress, even with susceptible plaintiffs, where allegations merely entailed being upset as a result of defendants' conduct), and Kennedy v. Town of Billerica, 617 F.3d 520, 530-31 (1st Cir. 2010) (upholding nine-year-old plaintiff's alleged emotional harm to be insufficient for IIED where harm amounted to fear of officer at time of arrest and fear of going to court, general nervousness, fear of police sirens, and occasional nightmares that produced sweating and a racing pulse), with Homesavers Council of Greenfield Gardens, Inc. v. Sanchez, 874 N.E.2d 497, 504 (Mass. App. Ct. 2007) (finding sufficiently severe emotional distress where plaintiff presented evidence of severe depression, suicidal thoughts, and loss of sleep for more than a month). Indeed, plaintiffs must produce evidence sufficient to show that their distress was "severe." Howcroft v. City of Peabody, 747 N.E.2d 729, 747 (Mass. App. Ct. 2001). A "plaintiff cannot prevail with mere emotional responses including anger, sadness, anxiety, and distress." Miller v. Pugliese, 693 F. Supp. 3d 163, 184 (D. Mass. 2023).

Plaintiffs fail to satisfy their burden to establish "severe" harm "that no reasonable [person] could be expected to endure." See Agis, 355 N.E.2d at 319. Most of the "emotional" damages suffered are more properly categorized as economic or material damages, such as their allegations they suffered a loss of their business and ministry. [SAMF 90; ECF No. 51 at 23-25]. Rizzuti Sr. specified that he was concerned and emotionally upset and concerned for what his family members went through but did not experience *personal* emotional harm. [SAMF, Ex. 5 (Rizzuti Sr. Dep.) at 135:2-10]. Rizzuti Jr. claimed anxiety and "lack of trust" with the police. [SAMF, Ex. 8 (Rizzuti

Jr. Dep.) at 179:17-180:16]. And, in response to a question regarding further impacts of emotional trauma on their daily life, both Rizzuti Sr. and Rizzuti Jr. talked more about negative consequences to their Church and status within their religious community rather than internal emotional or mental harm. [SAMF, Ex. 5 (Rizzuti Sr. Dep.) at 138:7-141:2; SAMF, Ex. 8 (Rizzuti Jr. Dep.) at 172:3-173:6]. Karissa claims she suffers from anxiety, specifically involving police officers, because of this incident. [SAMF, Ex. 10 (Karissa Dep.) at 137:5-138:14]; see Kennedy, 617 F.3d at 531. Furthermore, though not dispositive, neither Rizzuti Sr., Rizzuti Jr., nor Karissa sought psychological counseling. [SAMF, Ex. 5 (Rizzuti Sr. Dep.) at 135:11-16; SAMF, Ex. 8 (Rizzuti Jr. Dep.) at 170:18-23; SAMF, Ex. 10 (Karissa Dep.) at 136:3-6]; see LeBeau v. Town of Spencer, 167 F. Supp. 2d 449, 457 (D. Mass. 2001) (holding plaintiffs did not offer sufficient evidence of severe emotional distress where they did not seek psychological counseling). While there are claims of distress, such as feelings of anxiety around police officers and lack of trust allegedly prompting Rizzuti Jr. and Karissa to move, they do not rise to the high level of harm required for IIED under Massachusetts law.[24] Compare LeBeau, 167 F. Supp. 2d at 457 (holding alleged defamation's impact on family and children leading family to transfer school districts, though distressful if proved, did not rise to the level of harm for IIED), with Simon v. Solomon, 431 N.E.2d 556, 560 (Mass. 1982) (affirming judgment of reckless infliction of emotional distress

---

[24] It has come to the Court's attention through a motion in limine that Plaintiffs' expert reports were untimely disclosed. [ECF No. 61, ECF No. 49-28, 49-29, 49-30]. Pursuant to Rule 37(c)(1), the Court will not consider this evidence on summary judgment, as this evidence was not accessible to Defendants before they filed their motion for summary judgment. Fed. R. Civ. P. 37(c)(1). Plaintiffs did not offer a justification, and this disclosure is not harmless, particularly at the summary judgment stage. See Eldridge v. Gordon Bros. Grp., L.L.C., 863 F.3d 66, 85 (1st Cir. 2017) (explaining that the party facing sanctions has "the burden of proving substantial justification or harmlessness to get a penalty less severe than evidence preclusion."). Accordingly, pursuant to Fed. R. Civ. P. 37(c)(1), the required sanction in this case is mandatory preclusion of the untimely produced evidence. See also Harriman v. Hancock County, 627 F.3d 22, 30 (1st Cir. 2010) ("Rule 37 authorizes district courts to sanction noncomplying parties . . . the required sanction in the ordinary case is mandatory preclusion." (citation modified)). Despite Plaintiffs' motion to correct [ECF No. 92], the Court will not reconsider preclusion at the summary judgment stage, as the motion merely corrected subsections (v) and (vi) of Rule 26(2)(B) for trial and did not proffer a justification or show harmlessness at the summary judgment stage for its admitted untimeliness. [See also ECF No. 93]. The Court may consider the evidence for trial in light of the motion to correct at a later date.

where plaintiff suffered emotional distress so severe she was unable to care for her children and sought psychiatric counseling). These claims are insufficient to establish severe emotional harm which "no reasonable [person] could be expected to endure[.]" See Agis, 355 N.E.2d at 319. "While it is reasonable to conclude that, for most people, arrest is a traumatic experience . . . . This factor alone does not give rise to a claim for intentional infliction of emotional distress." Sheppard v. Aloisi, 384 F. Supp. 2d 478, 495 (D. Mass. 2005) (citation modified). Accordingly, the motion for summary judgment must be granted for Count XIII in Defendants' favor.

### E.  **Common Law Immunity for State Law Claims**

Applicable state law regarding immunity is binding on federal court with respect to state causes of action. See Hatch v. Town of Middletown, 311 F.3d 83, 91 (1st Cir. 2002) (applying Rhode Island law to determine whether police captain entitled to qualified immunity from state law privacy claim). Under Massachusetts common law, "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." Nelson v. Salem State Coll., 845 N.E. 2d 338, 348 (Mass. 2006). This is a distinct standard from the federal qualified immunity doctrine.[25] See Nasir v. Town of Foxborough, No. 19-CV-11196-DJC, 2020 WL 1027780, at *8 (D. Mass. Mar. 3, 2020). This doctrine also takes "every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." Id., at *9 (quoting S. Bost. Betterment Tr. Corp. v. Bost. Redevelopment Auth., 777 N.E.2d 812, 820 (Mass. 2002)). However, an officer is not entitled to qualified immunity if they act in "bad faith or [with] malice." Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 144

---

[25] Defendants maintain that the federal qualified immunity and common law immunity converge, requiring the existence of a clearly established right for their application. [See ECF No. 40 at 32]. Defendants' characterization of the common law immunity framework is plainly wrong. Indeed, "overcoming Massachusetts' common law immunity requires more" than the standard for qualified immunity. Nasir, 2020 WL 1027780, at *9.

(1st Cir. 2016). "To overcome this presumption, the plaintiff bears the burden of showing that the officials acted in bad faith or with malice." Bresler v. Muster, 258 N.E.3d 1134, 1146 (Mass. 2025) (citing Maxwell v. AIG Domestic Claims, Inc., 950 N.E.2d 40, 51 (Mass. 2011)). "Bad faith" is defined as a more than "bad judgment or negligence, . . . suggest[ing] a dishonest purpose or some moral obliquity, a conscious doing of wrong, or a breach of a known duty through some motive of interest or ill will," id., whereas "malice" is defined as a "wrongful act, done intentionally, without just cause or excuse," Brothers v. Town of Millbury, No. 14-CV-10122-TSH, 2014 WL 4102436, at *11 (D. Mass. Aug. 14, 2014).

Here, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Cappabianca and Nunez acted in bad faith or with malice, thereby defeating their claim to common law immunity on the state law claims.[26] If a reasonable jury credited Plaintiffs' accounts, a reasonable inference could be made that Cappabianca and Nunez acted in bad faith or with malice in their interactions with Rizzuti Sr. and Karissa. See Maroney as Trustee of Premiere Realty Trust v. Fiorentini, 673 F. Supp. 3d 30, 60 (D. Mass. 2023); Newman v. Massachusetts, 884 F.2d 19, 27-28 (1st Cir. 1989). Moreover, the record contains evidence from which a jury could infer these traits. [See, e.g., SAMF ¶¶ 11, 13, 16, 31, 40-41]. Accordingly, common law immunity is inappropriate at this stage.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 38) is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is appropriate in Defendants' favor as to all claims, except Rizzuti Sr.'s federal retaliatory arrest (Count I), state

---

[26] Specifically, Rizzuti Sr.'s false arrest (Count XI) and malicious prosecution (Count X) claims, and Karissa's assault and battery (Count VI) claim. See Holden v. Barry, 501 F. Supp. 3d 11 (D. Mass. 2020) (false imprisonment); Abubardar v. Gross, 542 F. Supp. 3d 69, 77-78 (D. Mass. 2021) (malicious prosecution); Montrond v. Spencer, No. 17-CV-10505-ADB, 2020 WL 13789690 (D. Mass. Feb. 4, 2020).

malicious prosecution (Count X), and false arrest (Count XI) claims; as well as Karissa's excessive force (Count III) and assault and battery (Count VI) claims. Because Defendants are entitled to qualified immunity as to Counts I, III, and XI, the only surviving claims consist of Count VI and, as they relate to Rizzuti Sr., Counts X and XI.

**SO ORDERED**.

Dated: July 18, 2025

  */s/ Margaret R. Guzman*  
Margaret R. Guzman  
United States District Judge